**AMERICAN OIL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1821.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1979.

Decided July 26, 1979.

John J. McGirl, Jr., Doherty, Rumble & Butler, Minneapolis, Minn. (argued), Bruce C. Faulken, Minneapolis, Minn. and Robert M. O'Connell, Legal Dept., Standard Oil Co. (Indiana), Chicago, Ill., on brief for petitioner.

Joel M. Cohn, Atty., N. L. R. B., Washington, D. C. (argued), John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D. C., on brief for respondent.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and MacLAUGHLIN, District Judge.*

GIBSON, Chief Judge.

American Oil Company (Amoco) petitions this court to review and set aside an order issued against it by the National Labor Relations Board (NLRB) on September 22, 1978, finding that Amoco had engaged in unfair labor practices in violation of section 8(a)(1) and (5) of the National Labor Rela-

---

* The Honorable Harry H. MacLaughlin, United States District Judge, District of Minnesota, sitting by designation.

tions Act (N.L.R.A.), 29 U.S.C. § 158(a)(1) and (5). The NLRB cross-applies for enforcement of its order.

Amoco operates an oil refinery in Mandan, North Dakota. The operating and maintenance employees at this plant form a bargaining unit represented by the Oil, Chemical and Atomic Workers International Union Local No. 6–10 AFL–CIO (union). The union and Amoco began their bargaining relationship in 1955, and a collective bargaining agreement which had become effective January 8, 1977, governed their relationship at the time of the alleged unfair labor practices.

Operations at the Mandan refinery separate into five divisions. The subject of the Board's finding of an unfair labor practice in this case was Amoco's revision, without consulting or bargaining with the union, of a work schedule in the oil movements division of the refinery. The oil movements division operates with three 8-hour shifts. Three workers man the day shift from 8 a. m. to 4 p. m., while only two workers man the evening shift from 4 p. m. to midnight and the graveyard shift from midnight to 8 a. m. In an attempt to equalize the desirability of the three shifts, Amoco pays a fifty cent per hour premium over the day rate to employees working the evening shift, and a ninety cent per hour premium to those working the graveyard shift. *See* Article VI of the collective bargaining agreement. Amoco assigns employees to the oil movements division on either a full-time or part-time basis. Full-time employees ordinarily work forty hours per week in the division; part-time employees work less than forty hours per week in the oil movements division and work the rest of their 40-hour week in other divisions of the refinery. The division employees man the shifts on a rotating basis pursuant to weekly schedules which notify the employees of their work times for the following week. Amoco prepares these weekly schedules and posts them in accordance with the following provisions of the collective bargaining agreement:

ARTICLE III

Hours of Work

Section 1. The workweek will fall within a period of seven (7) consecutive calendar days beginning on Monday at 12:01 a. m.

Section 2. A normal workday will be eight (8) hours and a basic workweek will be forty (40) hours. Most regular day workers will work from 8:00 a. m. to 4:30 p. m. with one-half (½) hour for lunch.

Schedule for hourly employees, other than regular day workers will be posted weekly. Ordinarily, they will be for five (5) eight (8) hour shifts per week with two consecutive days off. Circumstances may require some employees to work other hours, but irregular schedules will be followed only when efficient operations require it.

Additionally, since 1956, Amoco has given employees copies of a "simplified" work schedule. This schedule is also referred to as an annual master work schedule. The posted weekly schedule is generally typed from the relevant week of the simplified schedule, with any deviations penned in. Deviations are occasioned by employees trading work assignments, employee illness, and the need to accommodate overtime work. As a result of the distribution of the simplified schedule, each full-time division employee learns before January roughly the days and shifts he will be working during the year.

On August 15, 1977, Amoco implemented a new simplified schedule, replacing the previous schedule that had been in use since 1971. The 1971 schedule was designed to accommodate nine full-time division employees, whereas the new schedule was designed for a group of only eight full-time employees. Since the manpower requirement of the division remained stable, the change required greater use of part-time employees within the division.[1] The new schedule assigned the part-time employees

---

1. The impetus for the schedule change was the voluntary transfer out of the division of one of the nine full-time division employees. Amoco decided to modify the schedule rather than replace the employee.

more frequently to the day shift than to the evening and graveyard shifts.

On August 10, 1977, the union president, James Gerl, reacting to rumors of the impending schedule change, contacted Alan Symonais, Amoco's manager of employee relations and accounting services. Symonais stated that he had heard of the change but had not seen a new schedule. Gerl then informed him that he believed that the proposed change was an issue for bargaining, and requested that no change be put into effect until the union had been given an opportunity to bargain over it. The next day, an employee in the oil movements division informed Gerl that the new schedule was being prepared. Gerl then called Mr. Symonais, who confirmed that the new schedule was going into effect. On August 15, 1977, the new schedule was implemented.

The union filed with the Board an unfair labor practice charge on August 15, 1977. Thereafter, the Board general counsel issued a complaint on January 31, 1978, alleging that Amoco had violated section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by refusing to bargain over the change in the simplified work schedule. A hearing was held on March 16, 1978, in Bismarck, North Dakota, before an administrative law judge, who issued an order on June 30, 1978, finding that Amoco had violated section 8(a)(1) and (5) of the N.L.R.A. On September 22, 1978, the Board affirmed the rulings, findings of fact, and conclusions of law of the administrative law judge and adopted his recommended order. Amoco petitions for review in this court pursuant to section 10(f) of the N.L.R.A., 29 U.S.C. § 160(f). The Board cross-applies for enforcement of its order.

■ Since Amoco admits that it did not consult the union before implementing the change in the simplified schedule of the oil movements division, the issue presented is whether Amoco had a duty to bargain with the union over the proposed change in the simplified schedule before putting it into effect.

Amoco posits two defenses. First, it argues that it did not have a duty to bargain with the union over the proposed revision because the change did not have a "significant or material" impact upon the terms and conditions of employment. Section 8(a)(5) of the N.L.R.A., 29 U.S.C. § 158(a)(5), states that "it shall be an unfair labor practice for an employer—(5) to refuse to bargain collectively with representatives of his employees * * *." Section 8(d), 29 U.S.C. § 158(d), defines the phrase "to bargain collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, * * *."

Amoco admitted at oral argument that hours are mandatory subjects of bargaining; indeed it would be sophomoric to contend otherwise in the face of the clear and plain statutory language that has been supported by a lengthy history and practice. *See NLRB v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 348–49, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). It is also established that the term "hours" refers to more than merely the quantity of hours worked. In *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co., Inc.,* 381 U.S. 676, 691, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), Justice White stated in an opinion joined by two other members of the Court, that "we think that the particular hours of the day and the particular days of the week during which employees shall be required to work are subjects well within the realm of 'wages, hours, and other terms and conditions of employment' about which employers and unions must bargain." *See also* 381 U.S. at 699–700, 85 S.Ct. at 1602 (opinion of Goldberg, J., accepting the rationale of Justice White's remarks). *Cf.* 381 U.S. at 737–38, 85 S.Ct. 1596 (Douglas J., dissenting); *Mackey v. National Football League,* 543 F.2d 606, 615 (8th Cir. 1976), *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *International Wood-*

*workers Local 3–10 v. NLRB,* 127 U.S.App. D.C. 81, 82–83, 380 F.2d 628, 629–30 (1967).

Amoco, however, contends, citing the standard in *Allied Chemical & Alkali Workers Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 179, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), that the change in the simplified schedule did not "vitally affect" the terms and conditions of employment. The United States Supreme Court has recently addressed this argument in an opinion that we find dispositive of the issue of whether the proposed schedule change involved a mandatory subject of bargaining. In *Ford Motor Co. v. NLRB,* —— U.S. ——, ——, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), the Court clarified the use of the *Pittsburgh Plate Glass* standard, that subjects must "vitally affect" the terms and conditions of employment in order to qualify as mandatory bargaining subjects. The Court clearly relegated the use of this standard only to matters also involving individuals outside the employment relationship (as were the retirees in *Pittsburgh Plate Glass*); when no third party interest is directly implicated the standard does not apply.[2] Neither party in this case has indicated that the change in the simplified schedule in any way affects third parties outside the employment relationship and we do not perceive how a third party interest could be implicated.

*Ford Motor Co.* also addressed the argument that a matter is too trivial to qualify as a mandatory subject of bargaining. The Court indicated that it would defer to the evaluation of the bargaining unit employees and the Board in determining whether a matter is trivial, unless presented with a logical basis for rejecting it. —— U.S. at ——, 99 S.Ct. 1842. The change in the simplified schedule deprived full-time employees within the division of thirteen day shifts per year and eight weekend days which created the loss of four to five full weekends.[3] The schedule change also embodied a decision to abolish one full-time operator position within the division. This decision to deprive a part-time operator of the opportunity to become a full-time division employee may be considered disadvantageous in that only a full-time operator has the benefit of the simplified schedule giving him advance knowledge of his work assignments. The testimony before the administrative law judge indicated that the union did not consider these changes trivial.

The Board agreed with this position and found that the modified schedule constituted a material change in the terms and conditions of employment. It noted that the effect of changes on the employees is not to be measured in economic terms alone.

**2.** The Court in *Pittsburgh Plate Glass* addressed the issue of whether an employer's unilateral modification during the term of the collective bargaining agreement of the benefits of already retired employees constituted an unfair labor practice. After finding that the term "employees" contained in the N.L.R.A. did not encompass the retirees, the Court concluded that their benefits were not mandatory subjects of bargaining. It rejected the contention that the retirees' benefits "vitally" affected the "terms and conditions of employment" of the active employees by influencing the value of their current and future benefits. 404 U.S. at 176–82, 92 S.Ct. 383. Many of the factors used in determining whether the retirees' benefits constituted a mandatory subject of bargaining are irrelevant in the context of the present case, where the controverted matter relates solely to the relationship between the employer and the active employees and involves a tradi-

tional subject of bargaining explicitly referred to in 29 U.S.C. § 158(d).

**3.** Amoco contends, however, that the schedule change does not genuinely deprive employees of benefits, because the Board presented insufficient evidence to establish that most oil movements division employees prefer the day shift. It argues that its wage differentials create an inference that all shifts are equally desirable. The wage differentials themselves attest to the general undesirability of the evening and graveyard shifts, and one employee specifically testified regarding his preference for the day shift. Furthermore, it cannot be doubted that the change alters the existing employment relationship. Whether the alteration is beneficial or detrimental to the employees is a decision reserved to the employees as represented by their union.

Thus, we conclude that the Board correctly found that the issue of revision of the simplified schedule constituted a mandatory subject of bargaining.

 Amoco's other defense is that the union has waived any right to bargain about the proposed schedule change during the term of the collective bargaining agreement because the subjects of hours and work schedules are specifically and completely covered in the agreement.[4] Amoco states that the provisions of Article III of the collective bargaining agreement, which have been quoted *ante* at 3, state the parties' complete agreement with respect to hours worked and work schedules. It argues that as long as Amoco adheres to these contractual provisions, it is free to create or modify work schedules.

The Board's position is that absent specific contract provisions allowing the employer to change shift schedules any modification must be bargained about since it concerns hours and affects employee working conditions within the meaning of section 8(d) of the N.L.R.A. This position accords with the settled law regarding unilateral modification by an employer of mandatory subjects of bargaining.

This court, in *NLRB v. St. Louis Cordage Mills*, 424 F.2d 976, 979 (8th Cir. 1970), stated:

> As a starting point, we recognize as settled * * * that, ordinarily, an employer violates section 8(a)(5) and (1) when, absent waiver by the appropriate bargaining agent of its employees, it changes the wages or hours of any of its employees, or alters any other valuable incident of their employment, without allowing the bargaining agent an appropriate and meaningful opportunity to bar-

gain about the change or alteration. Section 8(d) of the Act, 29 U.S.C. § 158(d), itself a delineation of the import of § 8(a)(5), makes this principle abundantly clear.

*See also NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 425, 430, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *N L Industries, Inc. v. NLRB*, 536 F.2d 786, 789 (8th Cir. 1976); *International Woodworkers Local 3–10 v. NLRB*, 127 U.S.App. D.C. 81, 82–83, 380 F.2d 628, 629–30 (1967); *NLRB v. Wonder State Manufacturing Co.*, 344 F.2d 210, 215 (8th Cir. 1965). A finding of waiver depends upon whether an analysis of the contractual language and the facts and circumstances surrounding the making and administration of the collective bargaining agreement indicates whether there has been a clear relinquishment of the bargaining right. "It is settled law that any waiver of the statutory right to bargain over a mandatory subject of bargaining must be in 'clear and unmistakable language.'" *N L Industries, Inc. v. NLRB*, 536 F.2d 786, 789 (8th Cir. 1976). Mere silence in the collective bargaining agreement on the subject matter does not constitute a waiver. *N L Industries, Inc. v. NLRB, supra* at 788–89; *NLRB v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393, 399–400 (7th Cir. 1971); *Timken Roller Bearing Co. v. NLRB*, 325 F.2d 746, 751 (6th Cir. 1963), *cert. denied*, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964). In *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), the Supreme Court stated: "Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, *resolution of new prob-*

---

4. The authority of the Board to provide relief for an employer's failure to bargain regarding a mandatory subject of bargaining is not diminished because of the claim that the subject is covered by the collective bargaining agreement. Although this contention mandates a review of the terms of the agreement to determine the extent of the contractual rights of the respective parties, a function generally reserved to resolution by the mechanism provided in the grievance procedure, the Board is not divested of jurisdiction to remedy an unfair labor practice. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 427–30, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); *Long Lake Lumber Co.*, 160 N.L.R.B. 1475, 1478 (1966), *reviewed sub nom., International Woodworkers Local 3–10 v. NLRB*, 127 U.S.App.D.C. 81, 380 F.2d 628 (1967) (required entry of remedial order for violation of § 8(a)(5); Board had withheld remedy on de minimis principle).

*lems not covered by existing agreements,* and the protection of employee rights already secured by contract." (Emphasis supplied.)

As Amoco states in its brief, "no provision in the Agreement requires the Company to prepare, maintain or post a *simplified* schedule." Thus the agreement appears to be silent regarding the controverted matter of Amoco's responsibilities concerning the simplified schedule; the agreement does not address the issue of whether Amoco has authority unilaterally to modify the hours of employment of the full-time division employees and to reduce the number of full-time positions within the division simply by revising the simplified schedule.

Furthermore, the Board found that the parties had a long history of bargaining over changes in schedules, including the adoption and revision of simplified schedules. This history does not comport with the contention that the union had waived its right to bargain over schedule changes; instead, it indicates that the union never intended to waive its right and actively participated whenever simplified schedules were modified.

The record reveals that prior to August 1977 Amoco had never modified the simplified schedule in the oil movements division without first notifying the union and discussing the proposed changes. In early 1970, Amoco proposed a simplified schedule which the union reviewed and accepted. Later in the same year, during one of the regular monthly meetings between the union and the company, Amoco proposed changing the simplified schedule to a nine-person rotation because of a manpower reduction. The union was dissatisfied with the proposed schedule and drafted a counter-proposal, which the company accepted

on November 16, 1970. This schedule drafted by the union was effective until August 15, 1977, when the company made the modification here challenged.

Amoco has also bargained with the union about simplified schedules for other divisions of the Mandan refinery.[5] In October 1966, Amoco apprised the union of desired modifications of the simplified schedules for the ultraformer and alkylations units. The union objected to the schedule changes at a meeting on November 11. The union objected that the new schedules would result in fewer day shifts and additional night and evening shifts for the full-time unit employees, and informed Amoco that split days off would violate the collective bargaining agreement. As a result of the discussions, the parties agreed to institute Amoco's proposals in one unit on a trial basis and leave the other unit under the existing schedule.[6]

Amoco seeks to characterize this evidence of bargaining history as merely informational discussions generally aimed at resolving disputes regarding the specific contract language of split days off. Amoco contends that "[b]y discussing with the Union a schedule ingredient in the context of grievance proceedings, Amoco did not bind itself to discuss all aspects of its work schedules with the union." This argument is inapposite. Amoco was bound to discuss work schedules with the union by virtue of the matter falling within the category of a mandatory subject of bargaining. The history of the discussions, however, combined with the silence of the collective bargaining agreement, indicates that the union did not intend to waive its right to bargain concerning the matters involved in the simplified schedules.

---

5. The 1970 agreement on the oil movements division schedule was concluded in the context of settling a grievance regarding a schedule in the combination unit that split days off in apparent violation of Article III of the collective bargaining agreement.

6. Between 1955 and 1976, Amoco and the union also discussed changes in the simplified schedule for laboratory employees. Apparent-

ly several reductions in manpower occurred during the course of those years, requiring schedule changes. Generally the company foreman in charge of the laboratory would draft a proposed schedule and discuss it with the employees and their union representative. Only once did the proposed schedule meet with an objection, and discussions with the supervisor evidently resolved this problem.

The Board's findings of fact are supported by substantial evidence on the record as a whole, and it applied correct principles of law. Therefore, we deny the petition to set aside the Board's order, and grant the Board's cross-application for enforcement of its order.

Order enforced.