**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HENRY VOGT MACHINE COMPANY, Respondent.**

**No. 81–1055.**

United States Court of Appeals,
Sixth Circuit.

Argued June 10, 1983.
Decided Oct. 10, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Diana Ceresi, Washington, D.C., argued, Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, Barbara Gehring, Washington, D.C., for petitioner.

James U. Smith, III, argued, Smith & Smith, Louisville, Ky., for respondent.

Before MERRITT and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

The parties to this proceeding have argued their case twice before this court. The first time was in April 1982, before a panel, one of whose members died before the panel reached any decision. The second argument was on June 10, 1983.

At the outset, we note that the Administrative Law Judge (ALJ) conducted an extensive evidentiary hearing and found the facts, (which the Board later admitted were largely uncontroverted) as well as the law, against the Board and dismissed the complaint. The Board reversed the ALJ's decision with one of the Board's three member panel dissenting.

The National Labor Relations Board (Board) held that the respondent Henry

Vogt Machine Company (Company) violated Section 8(a)(5), (3) and (1) of the National Labor Relations Act (Act) (29 U.S.C. § 158),[1] by revoking lunchroom privileges held by 12 laboratory employees, which the Company said they were not entitled to possess after they voted to join the 900 member production and maintenance unit of the Union. The collective bargaining agreement applicable thereto did not provide for such benefits and the Company was not required to provide them, nor did it have sufficient cafeteria space for all 900 bargaining unit members. The Board ordered the Company to cease and desist from withdrawing the cafeteria privilege of said 12 workers; from refusing to bargain collectively with the charging party union on the cafeteria benefits; and from otherwise interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by the Act. The Board ordered the cafeteria privilege reinstated and ordered that affected employees be made whole for any losses caused by the Company's action. It now seeks enforcement of its order.

For the reasons stated below we deny the Board's application for enforcement of its order, as it is not supported by substantial evidence and is contrary to law.

## I.

Respondent, Henry Vogt Machine Company, is a Kentucky corporation engaged in the manufacture and sale of power boilers, heat exchangers, ice machines, valves, fittings and other metal products. At its Louisville plant, it has about 900 production and maintenance employees who have for over 29 years been represented by Local Union 1693 of the United Steelworkers of America (Union), which Union has entered into a series of collective bargaining agreements with the Company. There are also

17 "die sinkers" who are represented by the International Die Sinkers Conference. The Company's office and clerical workers are not represented by a Union. In addition, the Louisville plant has 12 day shift laboratory employees who are the focus of the present dispute.

In 1977, the Board held a representation election to provide an opportunity for these non-union laboratory employees to join the Union, if they desired to do so. Shortly before the election, the employees were addressed by Werner Vogel, a Company vice-president, as to why they should vote not to join. He advised them in part as follows:

> Also for the non-union employees on the day shift, the company has the lunchroom in which all of you are eligible and have been invited to utilize for the nominal amount of $1.00 per week for five (5) lunches. This is far less than you would pay for one lunch outside and is probably less than your cost for bringing lunch from home. I do not know how many of you take advantage of this benefit but, it is available to you and because of space, is not available to our union shop employees. I believe that you will have to agree that this is a decided plus if you are taking advantage of it.

The laboratory employees voted to continue their non-union status.

In 1978, another representation election was held and again Vice-President Vogel addressed the laboratory employees as follows:

> Also for the non-union employees on the day shift, the company has the lunch room in which all of you may eat for the nominal cost of $1.00 per week for five lunches. This is far less than you would pay for one lunch outside and is undoubtedly less than your cost for bringing lunch from home. I do not know how

1. (a) It shall be an unfair labor practice for an employer—

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

> (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

. . . . .

> (5) to refuse to bargain collectively with the representatives of his employees, . . .

many of you take advantage of this benefit but, it is there if you want it. I believe that you will have to agree that this is a substantial benefit for those of you who are taking advantage of it.

The election notice stated that if the laboratory employees voted for the Union, then they would become part of the Union's production and maintenance bargaining unit. The collective bargaining agreement later entered into provided for many benefits including increased salary. The agreement, however, contained no provision for lunches for the 12 workers. This issue was not even raised by the Union negotiating committee in any of the lengthy bargaining sessions. The representation election was held on August 4, at which time the laboratory employees voted to join the Union and thereby become a part of the larger bargaining unit of more than 900 members. The Board certified the result on August 14, 1978.

Prior to their joining the Union, the laboratory employees were, along with office, engineering, sales and supervisory employees, carried on respondent's records as "office payroll." As such, they were entitled to certain benefits and privileges which were spelled out in a white booklet titled "Information for You and other Vogt Office, Engineering, Sales and Supervisory Employees". In this booklet is a section on Food Service which provides:

> You may bring your lunch or supper, or you may purchase food at the plant. Vending machines for hot and cold drinks, and snacks are located in various areas of the plant. *Day shift employees on office payroll are eligible to have lunch in the Company lunchroom on the third floor, front office.* (emphasis added)

At the same time, the Company had a blue booklet which covered all the Company's bargaining unit employees. This blue booklet is titled "Information for You and Other Employees At Vogt", and its Food Service section provides:

> You may bring your lunch or supper, or you may purchase food at the plant. Vending machines for hot and cold drinks, and snacks are located in various areas of the plant. The trucks of a caterer are in the Steel Storage Area of Department 28 and in the vicinity of Department 16, Machine Shop, during the lunch and supper periods.

When the laboratory employees were carried on "office payroll", they were eligible to have their lunches at the subsidized Company cafeteria,[2] at a cost of one dollar for five lunches a week. However, when they voted to join the Union (and shortly thereafter came under the terms and conditions of a newly negotiated contract), the company transferred them from office payroll to bargaining unit (plant) payroll, and their eligibility to use the cafeteria ceased.

At the time the laboratory employees chose Union representation, the production and maintenance members of the bargaining unit were already covered by an existing collective bargaining agreement. That agreement was scheduled to expire in the near future. Thus, rather than bargaining concerning the laboratory employees with respect to the period of time preceding the expiration of the existing contract, the Company and the Union agreed to delay bargaining until negotiations for a new collective bargaining agreement, which would cover all members of the bargaining unit, began in early September 1978. These negotiations commenced on September 7. They involved 19 lengthy sessions and resulted in a proposed contract covering many subjects, that was ratified on October 22 and took effect on October 23, 1978 (App. 195–213).

Both before and during negotiations, the Union held meetings where it gave its members, including the laboratory employees, an opportunity to make suggestions and help formulate proposals that would be submitted to the Company's negotiating team. It is clear from the record that the

---

**2.** The cafeteria consisted of a large, clean room seating 120 to 150 people and offered hot or cold lunches. Although it was large enough to accommodate the office payroll people, it clearly lacked the capacity to seat the 900 employees in the bargaining unit.

Union's proposals to the Company were made on the basis of benefits to be enjoyed by all bargaining unit members. The Union did not attempt to obtain special benefits or concessions for the 12 laboratory employees. The only proposals specifically directed toward the laboratory employees related to a determination of job classifications and wages, which had not previously been established for new bargaining unit members.

The record further reveals that before and throughout the negotiation process various laboratory employees advised the Union's negotiating committee that the Company was going to revoke their cafeteria privileges. As is shown below, the Union neither attempted nor intended to negotiate special benefits for the laboratory employees; rather the employees were told they would receive the same benefits as other workers in the unit and no more.

On October 23, 1978, the day the newly negotiated collective bargaining agreement took effect, the Company transferred the laboratory employees from office payroll to plant payroll and revoked their cafeteria privilege. Several laboratory employees complained to the Union causing the Union to mention the problem to Company officials. When no accommodation was reached, the Union filed a charge with the Board alleging violations of Section 8(a)(5), (3) and (1) of the Act.

## II.

The charges were heard by an ALJ. The General Counsel of the NLRB argued that revocation of the laboratory employees' lunchroom privilege resulted from those employees choosing to be represented by a union and that such revocation was inherently discriminatory. Following a review of all the facts, the ALJ concluded the Company's action was neither inherently discriminatory nor discriminatorily motivated. The ALJ further concluded the Union negotiating committee knew the Company intended to terminate the lunchroom privilege, and that its failure to raise the issue during any of the extensive negotiations which followed resulted in a waiver of its right to bargain over that issue. Having determined the Company did not violate Section 8(a)(5), (3) and (1) of the Act, the ALJ ordered the complaint dismissed in its entirety.

The ALJ's decision was appealed to a three member panel of the Board. In a split decision, the Board reversed the ALJ, concluding that although the facts were not in dispute, the Company's termination of the cafeteria privilege was made without prior notice to or consultation with the Union; that the Union did not waive its right to bargain over termination of the privilege; and that the Company's unilateral withdrawal of the benefits was inherently discriminatory.

## III.

Before us for review is the question of whether the Board's conclusions are supported by substantial evidence in the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We believe they are not.

## A.

The Board contends the Company unilaterally revoked the cafeteria privilege without first affording the Union an appropriate and meaningful opportunity to bargain over the issue. It says that where the Union has not waived its statutory bargaining rights, such action violates Section 8(a)(5) and (1) of the Act.

It is generally true that an employer violates Section 8 of the Act if it unilaterally changes a term or condition of employment over which it has a duty to bargain. *N.L.R.B. v. Allied Products Corp.,* 548 F.2d 644, 652 (6th Cir.1977). Such action does not violate the Act, however, if the Union has waived its right to bargain. Waiver will be found if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. *International Ladies Garment Workers Un-*

*ion v. N.L.R.B.,* 463 F.2d 907, 918 (D.C.Cir. 1972). The Board requires proof of clear and unequivocal notice such that the Union's subsequent failure to demand bargaining constitutes a "conscious relinquishment" of the right to bargain. *NL Industries, Inc.,* 220 NLRB 41, 43 (1975), *aff'd, NL Industries, Inc. v. N.L.R.B.,* 536 F.2d 786 (8th Cir.1976). Although we agree with the standard enunciated by the Board, substantial evidence does not support the Board's finding in this case that there was insufficient notice to point to conscious relinquishment of the right to bargain. Rather, the record reveals the Union's negotiating committee was well aware the Company intended to terminate the cafeteria privilege, but that the Union deliberately and consciously chose not to raise that issue at any time during the negotiations for the collective bargaining agreement.

For example, David Wagner, a laboratory employee whose cafeteria benefit was revoked, testified that in September 1978, he told "Basically the whole [negotiating] committee" that the Company was going to terminate the cafeteria privilege (App. 114). On October 22, just prior to the ratification vote, Wagner informed a committee member that as of that weekend the Company would no longer allow laboratory employees to use the cafeteria (App. 117). In other testimony, Wagner stated that since he was now a member of the bargaining unit he expected to get exactly the same benefits that other bargaining unit employees got (App. 95–96), and to be covered by the terms and conditions spelled out in the blue "Information for You" booklet given to bargaining unit members (App. 99–101).

Another laboratory employee, Roger McCombs, testified that during contract negotiations he talked several times with the Local Union president (also a member of the Union negotiating committee) to find out "... if we wouldn't be able to continue eating there." The president responded that he did not know, but that he would look into it "and talk to Hatfield [the Union's chief negotiator] about it" (App. 126).

Although Hatfield testified he could not recall being told by laboratory employees prior to the contract's ratification that the Company intended to revoke their cafeteria privilege (App. 75), he did testify that the Union did not intend to negotiate specific benefits for the laboratory employees that were not enjoyed by the bargaining unit as a whole (App. 60).

Another member of the Union's bargaining committee during the 1978 negotiations was Kenneth Tharp, the treasurer of the Union. In one of several meetings Tharp had with Wagner during the September 7 to October 22 negotiations, Wagner told Tharp that the laboratory employees wanted a retroactive pay raise negotiated for them by the Union. (This was because the Company had already granted a pay raise to its office payroll personnel). Tharp's response to Wagner was, "You are included in our bargaining unit and you will get the same as we get, at the same time." (App. 177). Tharp testified that during negotiations the Union made no demand for retroactive pay for the laboratory employees because, "I am sure the other 900 people [members of the bargaining unit] would have hit the roof if we tried something like that." (App. 177).

Thereafter, Tharp gave the following testimony:

Q "At the time the proposals were drafted and at the time of the August 20 meeting, was the [Union negotiating] committee aware that the laboratory employees had benefits which the general bargaining unit employees did not have?"

A "Yes, we knew about their benefits."

Q "Did the negotiating committee make any effort to preserve those benefits to the laboratory employees?"

A "No, we figured that it would be like them having their cake and eating it too, them having their benefits plus our benefits so we thought we should all have the same benefits."

Q "Was this ever explained to the laboratory employees?"

A "Yet, it was."

Q  "Would you tell the judge when this was explained to the laboratory employees?"

A  "The meetings that I just referred to that we had with Dave Wagoner (sic) and the rest of them, that explained how all the benefits that they were going to get by coming under our bargaining unit and they seemed to understand. I thought they did."

Q  "They never made any effort to get—"

A  "They never made a complaint at all."

Q  "I am directing your attention to the date of on or about October 18, 1978, and did you have a conference with Mr. Wagoner (sic) and any other members of the laboratory?"

A  "Yes, it was the day we had a meeting with the company, that afternoon, and Dave and two or three others from the lab came up and talked to us at lunchtime, about their classifications and at the time we were negotiating their classifications and rates of pay."

Q  "During that meeting was any reference made by Mr. Wagoner (sic) or any of the laboratory employees to the lunchroom benefit?"

A  "There was three or four from the lab and us five [members of the negotiating committee] and in the course of the conversation Dave said, 'Well, Brown told us today that this would be our last week in the lunchroom'."

Q  "David Wagoner (sic) said that?"

A  "Yes."

Q  "And you say the entire negotiating committee was present at that time?"

A  "Yes, I am sure they were."

Q  "What was the response of the negotiating committee, if any?"

A  "As far as a direct response, I don't think we gave a direct response. Everybody just shrugged their shoulders and grinned, like we knew it was coming."

Q  "At any time prior to this starting of negotiations was the union committee aware that this privilege was being taken away?"

A  "Yes, we have been aware when he [Vogel] read the letters the first time, they came back and told us what was read in the letters, back in '77."

Q  "The people who petitioned for the union?"

A  "Right. They would come and talk and tell us about the plant superintendent reading letters and tell us what was in them."

Q  "Was there any question in the committee's mind during the negotiations that this privilege would no longer be enjoyed by the laboratory employees?"

A  "We knew it wouldn't be."

Q  "Why was that?"

A  "Because we have 900 other union men who don't eat there and there was no way that we could say to let 12 people that have never, at the time, paid a penny in union dues, eat there when we had 900 people, some of whom had been paying union dues for as long as 30 years and tell them that they couldn't eat there. We didn't think it was fair."

Q  "Was it ever the intention or did the union negotiating committee ever propose benefits for the laboratory employees which would not be enjoyed by all the other bargaining unit members?"

A  "No."

Q  "Was it ever the intention that that would occur?"

A  "No, it certainly wasn't."

Q  "Following this October 18 meeting with Mr. Wagner, you say there was a negotiating meeting that afternoon?"

A  "With the company, yes."

Q  "Was any proposal made that afternoon on behalf of the laboratory employees to continue this lunchroom benefit?"

A  "No, we didn't say a word to the company about it."

Q  "Were there meetings following this October 18 meeting?"

A  "The 18th was on a Wednesday and we had meetings Thursday, Friday and Saturday, the 19th, 20th and the 21st."

Q  "At any of those meetings was any proposal made on behalf of the laboratory

employees to continue this lunchroom benefit?"

A "No."

(App. 179–182).

On the basis of the foregoing facts we do not believe that substantial evidence in the record considered as a whole supports the Board's conclusion that the Union's negotiating committee did not have notice the Company intended to terminate the laboratory employees' cafeteria privilege or that the Company revoked the benefit without first affording the Union an appropriate and meaningful opportunity to bargain over the issue. Rather, it appears the negotiating committee knew the benefit was about to be revoked and it had numerous opportunities during the 19 negotiating sessions to address the issue. Yet it knowingly and intentionally chose not to raise the issue for it did not wish to create dissension among its other 900 bargaining unit members, many of whom had been paying dues for years and did not enjoy the luncheon benefits. The committee consciously chose to negotiate the same package of benefits for all its bargaining unit members, including the laboratory employees.

We believe the facts indicate the Union voluntarily waived its right to bargain over the Company's planned termination of the laboratory employees' cafeteria privilege.

### B.

The Board further concluded:

... the abrupt, unilateral change in working conditions after the laboratory employees chose to be represented by the Charging Party contained a clear and dramatic message for the employees who chose the Union and for the remaining unrepresented employees, and thereby discouraged membership in unions and coerced employees in the exercise of rights guaranteed them in Section 7 of the Act.

■ Again, to withstand attack, the Board's conclusion must be supported by substantial evidence on the record considered as a whole. *Universal Camera Corp., supra.* We do not believe that sub-stantial evidence supports the Board's contention that the Company's action was so inherently destructive of important employee rights that no proof of anti-union motivation is needed. *See, NLRB v. Great Dane Trailers,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

As noted previously, the Union negotiating committee was well aware the Company intended to terminate the cafeteria privilege. In addition, we note that the Company did not terminate the benefit at the time the laboratory employees voted to join the Union; rather they were permitted to continue using the cafeteria throughout the negotiation period. Thus the Union had ample opportunity to bargain over the Company's proposed change. *Compare, Federal-Mogul Corp.,* 209 NLRB 343 (1974) (Following NLRB certification, the Company immediately applied the existing contract to newly "Globed-in" employees without affording their Union an opportunity to negotiate regarding the contractual terms that would apply to them).

Had the negotiating committee felt the cafeteria privilege constituted a sufficiently important issue over which to bargain, it could have done so at any time throughout the negotiation process. It knew the privilege was about to be terminated. Yet despite this knowledge and its having ample opportunity to address the issue, the Union chose to do nothing. Given the fact that the withdrawal of benefits was not unilateral, but was the result of the Union's waiver of the right to bargain over the issue, the Company's action cannot be characterized as "inherently discriminatory."

■ Neither do we believe substantial evidence supports the Board's conclusion that the company's action was discriminatorily motivated. The Company distributed to its office payroll personnel the white "Information for You" booklet, and to its plant payroll personnel the blue "Information for You" booklet. The white booklet, which was given to the laboratory employees when they were carried on office payroll, clearly stated in the Food Service sec-

tion that "Day Shift employees *on office payroll* are eligible to have their lunch in the Company lunchroom . . ." (emphasis added). The cafeteria simply was not large enough to accommodate the 900 plus members of the bargaining unit, and therefore company policy strictly limited the cafeteria privilege to day shift employees on office payroll. Substantial evidence does not support the conclusion that the laboratory employees were being punished or discriminated against because they chose to join the Union. Rather, when they joined the Union, they became members of the bargaining unit and no longer eligible under long established Company policy to use the cafeteria. And in this regard we note the Company did not revoke the privilege until the new contract took effect, thus giving the Union an opportunity to incorporate in the new collective bargaining agreement, language which would preserve the cafeteria privilege for the laboratory employees.

The company's position was consistent with both its and the Union's apparent understanding that as part of the larger bargaining unit, the laboratory employees would be treated the same as other bargaining unit members and would be accorded whatever rights and benefits they were entitled to under the collective bargaining agreement. It is not contested that the contract had no language preserving the laboratory employees' cafeteria privilege. Furthermore, Article 21 of the contract provides:

ENTIRE AGREEMENT

This contract expresses the entire agreement between the parties hereto. There are no understandings between the parties as to the subject matter of this contract other than as herein set forth. However, by mutual agreement the parties may amend this agreement.

It is not understandable just how the Board could reverse the decision of the Administrative Law Judge, who made findings on largely uncontroverted facts and adopted correct conclusions of law, as pointed out by dissenting Board member Penello with whom we agree. Also the Board ignored the fact that the lengthy Collective Bargaining Agreement, which was entered into after the election and after lengthy bargaining between negotiating members of the Union and Company, contained no provision with respect to the luncheon privileges of the 12 members of the 900 member unit. Although it provides for most everything else, it contains no such provision because the Union did not want to bring it up for discussion in any of the bargaining sessions. The Union did not want to treat the members of the unit differently. Undoubtedly, it must have believed that it would have a better chance for success in later making the charge before the Board and in this respect it was correct.

## IV.

For the above reasons, we find that substantial evidence on the record as a whole does not support the Board's conclusion with respect to adequacy of notice, waiver, and whether the Company's action was discriminatory. We therefore deny the Board's application for enforcement of its order.

NATHANIEL R. JONES, Circuit Judge, dissenting.

The majority overhauls the National Labor Relations Board's finding that respondent Henry Vogt Company (the Company) violated Sections 8(a)(5), (3) and (1) of the National Labor Relations Act by unilaterally revoking the laboratory employees' lunchroom privileges after those employees voted to join the union. Because I believe that in so doing the majority misconstrues the standard of review, misapplies the substantive legal standard and misperceives the factual circumstances of this case, I respectfully dissent.

Although they are not impervious to the standard of review that this Court must apply when considering findings of the NLRB, the majority seems to ignore that standard in its decision. This Court must affirm the Board's findings if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal*

*Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). *Accord NLRB v. Digital Paging System of Toledo,* 659 F.2d 725, 726 (6th Cir.1981). The Supreme Court has declared that the conclusions of the Board are to be upheld even if this Court would have rendered a different decision had the matter been before it *de novo.* *Universal Camera,* 340 U.S. at 493, 71 S.Ct. at 467. The question before this Court on appeal, therefore, is not whether we can architect a structure of facts that will stand opposed to the Board's findings. With the slightest bit of creativity, this Court could construct such a structure in every case. But the appellate process in this area is not an exercise in imagination. Rather we sit to analyze and review with great deference the findings of the NLRB. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). The Board's findings that the Company "refused to bargain" with the union in violation of §§ 8(a)(5) and (1) and that the Company discriminated against union activity in violation of § 8(a)(3) of the NLRA are both supported by substantial evidence.

## I.

### Sections 8(a)(5) and 8(a)(1)

As even the majority recognizes, it is well settled law that an employer may not refuse to bargain with the employees' designated representative concerning mandatory subjects of collective bargaining. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *NLRB v. Allied Products Corp.,* 548 F.2d 644, 652 (6th Cir.1977). The Supreme Court has held that in-plant food services made available by an employer are mandatory bargaining subjects because the "terms and conditions under which food is available on the job are plainly germane to the 'working environment.'" *Ford Motor Co. v. NLRB,* 441 U.S. 488, 498, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). The laboratory employees' cafeteria privilege, therefore, was a mandatory bargaining subject over which the Company had a duty to bargain.

The breach of that duty to bargain constitutes a violation of § 8(a)(5) unless the union has waived its right to bargain. The majority cites *International Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907 (D.C.Cir.1972) for the proposition that waiver will be found if the "Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue" (majority opinion, slip opinion p. 806). In that case, however, the court explicitly rejected the Company's effort to "escape its obligations" to bargain collectively with its employees. The court found "clearly fallacious" the Company's argument that "special circumstances" excused its unilateral action to relocate. *Ladies' Garment Workers,* 463 F.2d at 918. "[B]y piecing together various facts picked up," the Union in that case "reasonably *suspected*" that the Company would unilaterally relocate. The union did have some warning of the Company's unilateral action. But the Court held that "mere suspicion or conjecture cannot take the place of notice." *Ladies' Garment Workers,* 463 F.2d 907 (D.C.Cir.1972). *Citing NLRB v. Royal Plating & Polishing Co.,* 350 F.2d 191 (3rd Cir. 1965); *NLRB v. Rapid Bindery, Inc.,* 293 F.2d 170 (2nd Cir.1961). Hence although the majority cites *Ladies' Garment Workers* for the "waiver" standard, they do not take cognizance of the thrust of that decision.

Nor does the majority seemingly appreciate the waiver standard applied in the instant case by the NLRB. In its Order, the NLRB found "no 'clear and unequivocal' evidence pointing to a 'conscious relinquishment' by the union of any right to bargain about the cafeteria privileges, and that the union's failure to raise the issue was not tantamount to a waiver." 251 NLRB No. 40 August 21, 1980. The majority, which claims to "agree with" this standard, in reality misquotes the Board. "The Board," the majority writes, "requires proof of clear and unequivocal notice such that the union's subsequent failure to demand bargaining constitutes a 'conscious relinquishment' of the right to bargain." Plainly the Board did not require "clear and unequivocal no-

tice"; rather it required clear and unequivocal *evidence* of a conscious *relinquishment* of the right to bargain. The Board's standard focuses upon the waiver itself, while the majority's standard focuses upon the notice. What is crucial to the outcome of this case is whether the union *waived* its right to bargain, not whether the union had some notice of the Company's action. For a union with notice clearly has not waived its rights until it consciously relinquishes them. The lack of notice precludes waiver. Yet the presence of notice does not automatically constitute waiver. Notice is a necessary but not a sufficient element of waiver. The majority's reading of the record reveals that the union's negotiating committee was "well aware" of the Company's intentions. That awareness, the majority concludes, amounts to a waiver.

I cannot agree either with the majority's waiver standard or with their application of that standard to the facts of this case. The Board's finding that the union did not have sufficient notice of the Company's revocation of cafeteria benefits is supported by substantial evidence on the record as a whole. But even if the union had some notice of the Company's intended revocation, the union did not waive its right to bargain.

### A. Notice

Substantial evidence supports the Board's finding that the union did not receive sufficient notice. Notice of a contemplated unilateral change in the terms or conditions of employment must be formally given. *NLRB v. Sweet Lumber Co.,* 515 F.2d 785, 795 (10th Cir.1975). In *NLRB v. Rapid Bindery Inc.,* 293 F.2d at 176, the Second Circuit held that "conjecture or rumor is not an adequate substitute for an employer's formal notice to a union of a vital change in working conditions." Furthermore in *NLRB v. Nello Pistoresi & Son, Inc.,* 500 F.2d 399, 400 ·(9th Cir.1974), the Court held that "An employer violates Sections 8(a)(5) and 8(a)(1) of the Act when he unilaterally alters 'wages, hours, and other terms and conditions of employment,' ... without first *consulting* and negotiating

with the bargaining representative of his employees." (emphasis added). *Citing NLRB v. Katz,* 369 U.S. 736, 742–3, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *American Smelting & Refining Co. v. NLRB,* 406 F.2d 552 (9th Cir.1969), *cert. denied,* 395 U.S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969). Consistent with these opinions, the Ninth Circuit in *Clear Pine Mouldings, Inc. v. NLRB,* 632 F.2d 721 (9th Cir.1980), held that an employer's unilateral change in employees' health care benefits constituted a unilateral refusal to bargain. Despite the fact that "the parties talked about" this issue, the Court found that such conversation was not "notice" within the purposes of the National Labor Relations Act. The case law in this area clearly indicates that conjecture, suspicion, rumor and even conversation are insufficient notice. The NLRA requires formal notice and collective consultation over a change in a mandatory bargaining subject.

The Board certainly was justified in finding that the Company neither sent notice to the union of the change in cafeteria benefits nor consulted with the union about that. change. The majority points to the testimony of David Wagner, a laboratory employee, to the effect that, "basically the whole [Negotiating] Committee" was aware that the cafeteria privileges would be revoked. That portion of the record, however, also reveals that David Wagner approached the Negotiating Committee on that day to inquire about the status of his privilege. He asked "if we would·still be able to eat in the cafeteria because they told us that we wouldn't." (Record p. 114). The Committee, Wagner testified, "never said anything definite about what was going to go on" (Rec. p. 115). That Committee in fact was so indefinite about the cafeteria privileges that it was unable to "do anything ... until they take it away from us" (Rec. p. 115). This incident, on which the majority rests a great deal of its argument, is exactly the kind of occurrence that the Courts contemplated when they held that rumor, conjecture and suspicion are not sufficient notice. David Wagner clearly relied on Vogel's pre-election speeches or

heard a rumor that his cafeteria privileges would be revoked if he voted to join the union. He spread that rumor to the Negotiating Committee. The Committee's response to him was no less clearly an example of conjecture and suspicion. Such filtering down of industrial gossip is hardly the type of formal notice and consultation that the framers of the NLRA envisioned.

The majority opinion itself provides further evidence of the lack of sufficient notice. According to the majority, Roger McCombs, another laboratory employee, testified that he talked about the possibility of revocation several times ·with the ·local union president, who is also a member of the Negotiating Committee. "The president responded that he did not know, but that he would look into it and talk to Hatfield [the union's chief negotiator] about it." (App. 126, Maj.Opinion, p. 807). The local union president thus did not know whether the Company intended to revoke the cafeteria privileges. Moreover, Hatfield, the union's chief negotiator and the man to whom the president turned for information, "testified that he could not recall being told by laboratory employees prior to the contract's ratification that the Company intended to revoke their cafeteria privilege" (App. 75, Majority opinion, p. 807). Hatfield in fact testified that he "heard nothing about it until after the contract was concluded in October" (App. 44). The chief union negotiator only learned of the revocation of cafeteria benefits when the employees came to him after the privilege had been terminated. Hence, even the facts which the majority relies upon in its *de novo* reconstruction of the case clearly indicate that the union representatives did not receive sufficient notice of the planned termination.

Moreover, those members of the Committee who did receive some notice of the termination received it tardily. Notice must be given sufficiently in advance of the actual implementation of a change to allow a reasonable opportunity for bargaining over the Company's decision. *NLRB v. Crystal Springs Shirt Corp.*, 637 F.2d 399, 402 (5th Cir.1981); *Ladies' Garment Work-*

*ers*, 463 F.2d 907 (D.C.Cir.1972). In *Ladies' Garment Workers*, the Second Circuit stated that "no genuine bargaining ... can be conducted where the decision has already been made and implemented." *Citing Town & Country Mfg. Co. v. NLRB*, 316 F.2d 846 (5th Cir.1963). "Notice of a *fait accompli*," the court declared, "is simply not the sort of timely notice upon which the waiver defense is predicated." *Id.*

The only notice which the union Negotiating Committee actually received was of a *fait accompli*. The majority refers at length to a meeting between the Negotiating Committee and several laboratory employees during which the employees informed the Committee that the lunchroom privilege had been terminated. The Committee members did not give a "direct response," but "just shrugged their shoulders." (App. 181, majority opinion p. 808). At that meeting, the Committee members plainly received notice that the Company had decided to revoke the lunchroom privileges. But the majority ignores the fact that this meeting was held on October 18, 1978, just one business day before the contract was ratified. When the Committee finally received definite notice of the Company's intentions, the "decision had already been made." As *Ladies' Garment Workers* makes clear, the notice given to the union Negotiating Committee was not "the sort of timely notice" required by the NLRA.

Under the majority's reconstruction of the facts of this case, therefore, it is evident that the Union did not receive adequate notice of the Company's intention to eliminate the laboratory employee's cafeteria benefits. The evidence of the lack of notice, however, need not even be that formidable. The evidence need only support the explicit findings of the NLRB. There is no question in my mind that substantial evidence supports the Board's finding that the Union did not receive adequate notice of the change.

### B. Waiver

But even if the union's Negotiating Committee had received notice of the change in

cafeteria benefits, substantial evidence supports the Board's finding that the Committee did not "waive" its right to bargain over the issue. The majority opines that waiver requires a "conscious relinquishment" of the right to bargain. (Majority opinion, p. 807). The prevailing case law in this area mandates that "only clear and unmistakable language will warrant a conclusion that waiver was intended." *General Electric Co. v. NLRB,* 414 F.2d 918, 923 (4th Cir.1969); *See also NLRB v. Marine Optical, Inc.,* 671 F.2d 11, 16 (1st Cir.1981); *American Oil Co. v. NLRB,* 602 F.2d 184, 188 (8th Cir.1979). These cases clearly establish that a lucid communication of the desire to waive the right to bargain from the union to the Company is required before any waiver will be effective. Waiver must not be inferred from silence. *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746, 751 (6th Cir.), *cert. denied,* 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964).

In its reconstruction, the majority improperly infers from the union's failure to make a proposal concerning the lunchroom privileges a waiver of the right to bargain. The majority cites the testimony of Tharp, who suggested that the Negotiating Committee did not demand the preservation of the cafeterial benefits. But the Committee's silence is not clear and unmistakable language of a waiver. Furthermore, the union's Chief Negotiator, Hatfield, testified that "it was always the intention of the union to negotiate" for the laboratory employees (App. 47). In "all [his] negotiations," Hatfield "intended to preserve a lunchroom privilege" for those employees. (App. 57).

When asked why the Negotiating Committee remained silent on this issue, Hatfield responded:

There was no need as far as I was concerned to try to attempt to change that. They had [the lunchroom privileges] until the day that the contract between the Company and the union was concluded.

(App. 68). Hatfield suggests that the Committee felt no need to fight the status quo. Under these circumstances, the Committee's

silence cannot constitute a conscious relinquishment of its right to bargain. I am fully satisfied that substantial evidence on the record as a whole supports the Board's finding that the union did not waive its right to bargain over the termination of laboratory employees cafeterial benefits. I am convinced, therefore, that the Company acted unilaterally in violation of Sections 8(a)(5) and (1) of the NLRA.

## II.

### Section 8(a)(3)

I am no less convinced that substantial evidence supports the Board's finding that the Company's termination of the laboratory employees' cafeteria benefits after they voted to join the union discouraged union membership and coerced employees in violation of § 8(a)(3) of the NLRA. The majority overhauls this finding, creating a theory in support of the notion that the company's termination of cafeterial benefits was not inherently discriminatory. Because the union waived the right to bargain over the issue, the majority opines, the Company's action cannot be characterized as discriminatory.

I, of course, do not agree that the union waived its right to bargain. But even if the union had waived its right to bargain, the Company's action still violates § 8(a)(3). That provision of the NLRA is designed to prevent employers from discouraging *employees* from joining a union. The provision thwarts employer efforts to coerce employees against union participation or to retaliate against employees who have joined a union. *NLRB v. Great Dane Trailers,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). Such coercion or retaliation can occur regardless of whether the Union Negotiating Committee waives its right to bargain over the relevant issue. The majority therefore errs when it concludes that *merely* because the Union Negotiating Committee waived its right to bargain over the termination of cafeterial benefits, the threatened and actual termination of those benefits could not be inherently destructive of employee organization. This Court

should have considered the effect upon the employees' exercise of their § 7 rights of the threatened and actual termination of lunchroom benefits.

The NLRB considered that effect and determined that the Company's relocation was inherently destructive of employees' organizational activity. I find substantial evidence on the record as a whole for the Board's findings. In *Great Dane*, the Supreme Court held that an affirmative demonstration of anti-union animus is only a necessary element in a § 8(a)(3) violation where the harm to employees' rights is comparatively slight and a substantial and legitimate business interest is served. 388 U.S. at 34, 87 S.Ct. at 1798. As the Board properly found in the instant case, the harm to employee rights is not "comparatively slight." In his pre-election speeches, the Company's Vice-President, Vogel, stressed that the laboratory employees' lunchroom privilege was a "decided plus." Vogel reminded these employees immediately before the union election that, as a consequence of their non-union status, they were able to purchase lunch for "far less" than were those who belonged to the union. More precisely, before the laboratory employees voted to join the union, they were able to buy lunch for $1.00 per week. After they voted to join the union, those employees had to pay $12.50 per week. Over the course of one year, the laboratory employees were forced to pay approximately $500.00 more as a consequence of voting to join the union. That amount is a significant percentage of a laboratory employee's salary. In strictly economic terms, $500.00 is not a "comparatively slight" harm to those employees who chose to join the union.

But more importantly, the "harm" to the employees' interests in this case goes to the core of their § 7 rights. These rights guarantee to employees the ability to participate in, develop and solidify organizational activity. The right to elect to join a union therefore is a fundamental right granted to employees by the NLRA. Any infringement on that fundamental right cannot be characterized as "slight." The substantial economic price of exercising fundamental § 7 rights thus does not constitute a "comparatively slight" harm to employee interests.

Furthermore the Company has not demonstrated that this "harm" to employee rights is justified by a "substantial and legitimate business interest." The majority claims that space limitation in the lunchroom is such an interest. But even the most cursory reading of the record reveals that this "interest" is specious. Space in the lunchroom only becomes a problem if the employees who did not enjoy the privilege of eating there before the election were granted that privilege after the election. No one is suggesting that this happened. What the Board requires is only that the status quo be maintained. The Company admitted that there was no substantial change in the number of laboratory employees between the election and the discontinuation of the cafeteria privilege. Therefore, no real space problem exists. Rather the fact of "spatial limitations" is only a *post hoc* justification offered by the Company. That justification, as the Board properly found, is without merit. Because the significant harm to employee interests is not justified by a substantial and legitimate business interest, the appellant need not show anti-union animus to demonstrate a § 8(a)(3) violation.

Substantial evidence supports the Board's finding that the union has met the limited burden of showing that the Company's action was inherently destructive of employee interests. In *NLRB v. McCann Steel Co.*, 448 F.2d 277, 279 (6th Cir.1971), this Circuit held that employer conduct that is inherently destructive of employees' § 7 rights and that is carried out in retaliation for the exercise of those rights violates § 8(a)(3). *Accord NLRB v. Electric Steam Radiator Corp.*, 321 F.2d 733 (6th Cir.1963). In *McCann Steel*, the employer reduced its yearly Christmas bonus after employees voted to join the union, while in *Electric Steam Radiator*, the employer revoked a similar fringe benefit following a successful union representation election. In both

cases, this Court held that the employer's retaliatory action was inherently destructive of employee interests in violation of § 8(a)(3).

In the instant case as well, the employer's retaliatory action was inherently destructive of employee organizational activity. Vice-President Vogel spoke twice to the laboratory employees. Interestingly each speech occurred just before a union election. In the first speech, Vogel reminded the laboratory employees that they had the privilege. Many of those employees did not know of the privilege. One employee, Roger McCombs, testified that, "when Mr. Vogel said that we had the right, we all started going up there as a group" (App. 123). Vogel encouraged the employees to use the lunchroom, then told them that if they decided to join the union they could no longer use the lunchroom. The NLRB could derive from these events substantial evidence that the Company's Vice-President used the lunchroom benefit as a lever to discourage union membership.

When the laboratory employees finally voted to join the union, the Company exercised that lever in retaliation. David Harbin, the Company's Personnel Manager, testified that the *only* reason that the laboratory employees' lunchroom privilege was discontinued was because they voted to join the union (App. 165). The Company in effect admits that the revocation of a significant benefit was solely in retaliation for union activity. I am convinced by this clear evidence that the Company's action was inherently destructive of employee interests.

But I need not be so convinced. All that this Court must do is review the evidence which convinced the Board. Plainly there is substantial evidence on the record as a whole from which the NLRB could have found that the Company violated § 8(a)(3). Such substantial evidence also supports the Board's finding that the Company violated Sections 8(a)(5) and 8(a)(1) of the NLRA.

For the reasons expressed above, I cannot concur in the majority's *de novo* reconstruction of this case and respectfully dissent.