YHA, INC., Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross– Petitioner.**

Nos. 92–5866, 92–5909.

United States Court of Appeals, Sixth Circuit.

Argued June 10, 1993.

Decided Aug. 11, 1993.

G. Roger King (argued and briefed), William A. Nolan, Jones, Day, Reavis & Pogue, Columbus, OH, Jon R. Steen, Human Relations Resource Council, Youngstown, OH, for YHA, Inc.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Peter Winkler (briefed), Angela Washington (argued and briefed), N.L.R.B., Office of the General Counsel, Washington, DC, Frederick Calatrello, Director, Rufus L. Warr, N.L.R.B. Region 8, Cleveland, OH, for N.L.R.B.

Before: GUY and SUHRHEINRICH, Circuit Judges, and JOINER, Senior District Judge.*

JOINER, Senior District Judge.

YHA, Inc., petitions the court to set aside the order of the National Labor Relations Board, 1992 WL 122633, finding that YHA had violated § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), by refusing to bargain with the union representing its nonprofessional employees over the implementation of a no-smoking policy. YHA does not dispute that the policy constitutes a mandatory subject of bargaining, but contends that the union waived its right to bargain regarding the policy because it failed to make a timely bargaining demand. The NLRB cross-petitions for enforcement of its order requiring YHA to bargain with the union on request, rescind the no-smoking policy, and restore the prior smoking policy pending negotiations on the new policy.

We conclude that the union waived its right to bargain on the no-smoking policy, and thus set aside the Board's order and deny the Board's application for enforcement.

## I.

YHA is a subsidiary of the Western Reserve Care System, and operates several nonprofit health care facilities in the Youngstown, Ohio, area. The Service Employees International Union Local 627 (AFL–CIO) represents YHA's 1200–1300 nonprofessional service and maintenance employees, approximately one quarter of whom are smokers.

Prior to 1987, YHA imposed only minimal safety restrictions on smoking in its facilities. In 1987, the policy was revised to limit smoking to designated areas. Ken Lewis, president of Local 627, was invited to attend meetings on these revisions to the policy, but opted not to attend. During the proceedings in this case, he explained that he thought that the 1987 revisions were fair and reason-

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michi- gan, sitting by designation.

able and did not violate the rights of the members who smoked.

In late 1989, YHA's Board of Trustees adopted a resolution that all YHA facilities become smoke free by April 1, 1990. YHA's president sent a letter to employees suggesting that they make a New Year's resolution to quit smoking because the facilities would be smoke free by April 1, 1990. Additional letters were sent, and notices were posted on bulletin boards and included in the hospital newsletter.

Jack Mullen, YHA's assistant administrator, was assigned to implement the trustees' resolution. Mullen formed a "Smoke–Free Facilities Task Force," requesting representatives from various departments and constituencies within YHA, including the three unions which represented YHA employees. Mullen testified that he called Ken Lewis and told him that "we were headed towards a smoke-free policy" and that he was forming a task force to "look at . . . the best way to do that, to satisfy everyone. . . ." Lewis remembers only that he was asked to attend a meeting on a smoking policy. "They just wanted to talk about the smoking policy. They never indicated that they were going to prohibit smoking period. So I just kind of brushed it off as not being that important." Lewis designated union steward Bonnie Flannery to represent Local 627 at the task force meetings. Lewis told Mullen that Flannery was a heavy smoker who had strong feelings about smoking, and would provide vocal input to the task force.

The task force held five meetings between the end of January and the end of March 1990. Lewis testified that Flannery did not attend all of the meetings because they were held during work hours and she could not always get released from work. Although Local 627 in the past had secured a representative's release from work to attend meetings that were thought to be important, Lewis testified that he did not think that this particular task force was very important. Mullen recalled seeing Flannery at two of the meetings.

One week before each meeting, Mullen sent all task force members an agenda, each one entitled "Smoke–Free Facilities Task Force." A draft of the proposed no-smoking policy was attached to the agenda for the February 8 meeting. Under the heading "Employee and Visitor Smoking" the policy stated, "Under no circumstances will employees, physicians, volunteers, visitors, or others coming into WRCS facilities be permitted to smoke while in the buildings owned or leased by WRCS." This draft did not contain an effective date. Attached to the agenda for the March 7 meeting was the "final" draft of the no-smoking policy which contained the language quoted above as well as an effective date of April 1, 1990.

The task force coordinated the implementation of the no-smoking policy, e.g., ordering and posting new signs, investigating outdoor areas conducive to smoking, and working with the education and promotion subcommittee, the entity charged with compiling the information to be communicated to patients and visitors about the smoking ban. Steward Flannery served on that subcommittee as well as the Smoke–Free Facilities Task Force.

On Friday, March 23, Mullen held a meeting for the presidents of the three unions representing YHA's employees. Mullen stated that the meeting was the last opportunity to say to the unions, "we're going with this policy and we just wanted to let them know that this was the case, that we were proceeding." Sandra Butler, the director of personnel services, characterized the meeting as a "courtesy meeting" to review the terms and reasons for the policy. Dr. Gene Butcher attended to address the medical reasons for the policy.

The events of the meeting are disputed. Mullen and Butler contend that no bargaining demand was made by any of union presidents, although they acknowledge that Lewis and another union president discussed between themselves the possibility of seeking negotiation on the policy. Butler recalled that Lewis said that he was going to check with his attorney on whether the policy might be negotiable.

Lewis contends that he demanded bargaining at the March 23 meeting, and that Dr. Butcher said there would be no negotiations.

Lewis claims that when he pressed the issue, Dr. Butcher said that he had better things to do and left the meeting. The office of YHA Vice President William Cummins, the individual on whom bargaining demands were customarily made, was nearby the meeting room, but no demand to bargain was made to him that day.

On Tuesday, March 27, Lewis sent a letter to Cummins, requesting that YHA bargain over the no-smoking policy. No reference was made in this letter to the bargaining demand allegedly made at the meeting four days before. Lewis' letter was received on Friday, March 30, although Cummins did not see it until Monday, April 2, the first business day after the smoking ban went into effect. Cummins responded in writing, stating:

> I have received your letter regarding our policy on smoking restrictions. I am unsure as to your reasons why YHA, Inc. must now negotiate this matter with the Union. We have always looked upon the implementation of smoking restrictions in the Hospital as our right. We have implemented earlier phases of our smoking restriction policy without request from your Union to negotiate.

Lewis wrote again on April 10, requesting YHA to clarify its position. YHA did not respond, and Local 627 filed an unfair labor practice charge six weeks later, claiming that YHA had refused to bargain over the ban on smoking in its facilities.

Only four witnesses testified at the hearing before the administrative law judge: Lewis, Mullen, Butler and Cummins. The ALJ first stated that, to the extent that there were conflicts between the accounts of Lewis and Mullen, he would credit Lewis, who appeared to him to be honest and forthright, in contrast to Mullen, whose testimony he characterized as evasive at times concerning critical matters. No examples of this evasiveness were given. The ALJ thus credited Lewis' account of the March 23 meeting, finding that Lewis in fact made a bargaining demand at that time, and finding "unpersuasive the brief, and rather vague, testimony of Butler concerning events at the meeting." No ex-

amples of the vague nature of Butler's testimony were given.

The ALJ concluded:

> In light of the participation on the task force, however limited, of the Union's designee, Flannery, it may be argued that the Union learned, or should have learned, prior to March 23, that Respondent planned a substantial modification in its smoking policy. The fact remains, however, that Respondent did not formally and fully apprise the Union of its intent completely to eliminate employee smoking in its facilities until March 23, 1990. At that time, 9 days remained before the intended implementation of the new policy, an ample amount of time for bargaining about this issue. Upon being presented with Respondent's intended new policy, the Union immediately, forcefully and repeatedly demanded negotiations. Respondent refused to bargain, asserting that it "looked upon the implementation of smoking restrictions in the hospital as our right." In taking that approach, I find and conclude that Respondent failed to fulfill its bargaining obligation, in violation of Section 8(a)(5) of the Act.

(Footnote omitted; emphasis added.)

On review, the NLRB rejected YHA's contention that the agendas circulated by Mullen before each committee meeting notified Local 627 of the policy and its planned effective date of April 1, 1990. Like the ALJ, the NLRB concluded that Mullen did not tell Lewis the purpose of the task force when he called him early in 1990. "Thus, [YHA] led the Union to believe that the purpose of the task force was a general discussion of the smoking policy. Contrary to [YHA], we do not find that the documents referred to above were sufficient to dispel that belief." Despite the language that "[u]nder no circumstances will employees ... be permitted to smoke while in the buildings owned or leased by WRCS," the NLRB found that the draft policy circulated one week before the February 8 meeting had "nothing in it to indicate that its purpose was other than to promote general discussion of the smoking policy...." The NLRB found that the policy circulated the week before the March 8

meeting was insufficient to put the union on notice of the smoking ban despite the fact that the policy had the identical language and gave an effective date of April 1, 1990, and the agenda referred to the draft as "final."

We do not agree, however, that these factors require a finding that the March 7 draft put the Union on notice that the no-smoking policy would be implemented on April 1. Not only is the "Date Effective" of the draft given as "4/1/90," but the same date is given as the "Date Revised" and the "Date Reviewed." Consequently, it is difficult to determine from the face of the draft what significance, if any, to assign the "4/1/90" date. Further, as to the designation of this draft as the final one, we note that the word *final* on the March 7 agenda is surrounded by quotation marks, suggesting that it was "final" in name only and was subject to further general discussion by the task force. In these circumstances, for the other reasons stated by him, we agree with the judge that the Respondent did not "formally and fully apprise" the Union of its intentions until March 23.... [We further agree with the ALJ's finding] that the Union on and after March 23 repeatedly demanded negotiations over the policy and that [YHA] refused to bargain....

## II.

Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), provides that "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." The Supreme Court recently reinforced the limited standard of review applicable to agency determinations:

Second, the court disregarded well-established standards for reviewing the factual findings of agencies and instead made its own factual findings.... A court reviewing an agency's adjudicative action should accept the *agency's* factual findings if those findings are supported by substantial evidence on the record as a whole. The court should not supplant the agency's findings merely be identifying alternative

findings that could be supported by substantial evidence.

*Arkansas v. Oklahoma,* — U.S. —, —, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (citations omitted; emphasis in original).

In *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Court discussed the requirement of § 160 that a reviewing court canvass the record as a whole to ascertain whether substantial evidence supports the NLRB's decision. While a reviewing court must take into account whatever in the record detracts from the NLRB's decision, it is not permitted to displace the NLRB's choice between two fairly conflicting views, even if the court would have made a different choice if the matter had been before it de novo.

Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id.* at 488, 71 S.Ct. at 465.

Thus, this court cannot substitute its own findings for those of the Board merely because substantial evidence may support both. However, this court is required to canvass the record as a whole in making its determination. Moreover, in the unusual setting in which witnesses' versions of what occurred during their conversations are completely opposite, we must examine the credibility determinations with care. "A reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative agency action on appeal." *Krispy Kreme Doughnut Corp. v. NLRB,* 732 F.2d 1288, 1290 (6th Cir.1984).

An employer violates § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), if it unilaterally changes a term or condition of employment over which it has a duty to bargain with the union representing its employees. There is no such violation, however, if the union has waived its right to bargain. *NLRB v. Henry Vogt Mach. Co.,* 718 F.2d 802, 806 (6th Cir.1983).

■ Both the ALJ and the Board rejected YHA's claim that Local 627 waived its right to bargain on the no-smoking policy, finding that the union made a bargaining demand on the same date that it was "formally and fully" apprised of YHA's intent to eliminate smoking on its premises. The date on which "formal and full" notice is not relevant to our inquiry, however.

> Waiver will be found if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. The Board requires proof of clear and unequivocal notice such that Union's subsequent failure to demand bargaining constitutes a "conscious relinquishment" of the right to bargain.

*Henry Vogt Mach. Co.*, 718 F.2d at 806–07 (citations omitted).[1] Thus, while "formal and full" notice may be prudent, if only to preclude another from claiming ignorance, it is not required:

> [T]he Board has adopted a more pragmatic approach in a number of cases and has held that where a union had actual notice of an employer's intentions at a time when there was sufficient opportunity to bargain prior to implementation of the change, the employer may not be faulted for failing to afford formal notification.

*Medicenter, Mid–South Hosp.*, 221 N.L.R.B. 670, 678 (1975). *Accord W.W. Grainger Inc. v. NLRB*, 860 F.2d 244, 248 (7th Cir.1988).

Both the ALJ and the Board applied an erroneous legal standard in concluding that March 23 was the date on which Local 627 was given notice sufficient to impose an obligation to respond with a bargaining demand. While Local 627 received "formal and full" notice of the planned smoking ban on March 23, it received *actual* notice much earlier. Local 627 designated steward Flannery to serve on the task force. There was no dispute that she attended at least two of the meetings and that she received all of the agendas and their attachments, including the

draft no-smoking policies. The name given to the task force itself, as well as the draft policies circulated to task force members, provided clear and unequivocal notice to Local 627's duly appointed representative of YHA's intent to ban all smoking in its facilities. This actual notice was provided as early as December 1989 and restated on several occasions through March 1, 1990, the date on which the March 7 agenda and final draft of the no-smoking policy were circulated to task force members, including steward Flannery. In early February, a full draft of the policy was sent with the agenda for the February 8 meeting.

■ When an employer gives notice of a proposed change in terms and conditions of employment, the union must act with due diligence in requesting bargaining. Notice of four to eight days has been found sufficient to provide a meaningful opportunity to bargain. *Jim Walter Resources, Inc.*, 289 N.L.R.B. 1441, 1442 (1988).

> [W]here an employer has made a decision and announced it to the employees in a similar time period before its effective date, the Board has found the bargaining representative must do more than merely protest the change; it must meet its obligation to request bargaining. As those cases hold, any less diligence amounts to a waiver by the bargaining representative of its right to bargain.

*Id.* (footnotes omitted).

Having received actual notice of YHA's intent to ban smoking, Local 627 was obligated to make a timely bargaining demand to preserve its right to bargain. The ALJ and Board focused on March 23 as the date of "formal and full" notice and found that a demand was made at the March 23 meeting which was timely. However, in reviewing the record as a whole, we cannot conscientiously find substantial evidence in support of this finding. Mullen and Butler were unequivocal in their testimony that no bargaining demand was made at the March 23 meet-

---

1. In *Henry Vogt Mach. Co.*, the court concluded that the union had waived its right to bargain on the revocation of cafeteria privileges from a group of employees who recently joined the bargaining unit, because it found that the union had

notice of the employer's intention to revoke those privileges if the employees voted in favor of the union, and all other union employees did not have those privileges. 718 F.2d at 806–09.

ing. Rather, Butler recalled that Lewis intended to ask his attorney whether the issue was bargainable. Despite the fact that Cummins' office was near the meeting room, no bargaining demand was made to him on that date. Local 627's written bargaining demand, received in Cummins' office on the afternoon of March 30, made no reference to the demand allegedly made seven days earlier. Against this direct and circumstantial evidence is Lewis' claim that he made a bargaining demand. Lewis' testimony finds no corroboration in the accounts of other witnesses or in his own actions taken after the meeting. Viewed in light of the entire record, the ALJ's determination to credit Lewis' testimony over all of the other evidence is not reasonable.[2] *Krispy Kreme Doughnut Corp.*, 732 F.2d at 1293.

The procedure followed by YHA to develop the no-smoking policy demonstrates a sensitivity to the advisability that an employer provide early actual notice to the union of a proposed change in the terms or conditions of employment. The record reflects that Local 627 received actual notice of the no-smoking policy as early as late December 1989 and again in the beginning of February and March 1990, but did not demand bargaining on the issue until the afternoon of March 30, the last business day before the policy was to take effect. We hold that Local 627 waived its right to bargain.

We therefore **GRANT** YHA's petition to set aside the Board's order, and **DENY** the Board's cross-application for enforcement.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

An employee smoking policy, especially one with punitive elements to it, is a mandatory subject of bargaining. *See S.S. Kresge Co. v. NLRB*, 416 F.2d 1225, 1229–30 (6th Cir.1969). An employer generally violates sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act if it unilaterally changes a term or condition of employment over which it has a duty to bargain. *NLRB v. Henry Vogt Mach. Co.*, 718 F.2d 802, 806

(6th Cir.1983). No violation will be found, however, if the union has waived its statutory bargaining right. Waiver is manifest "if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. The Board requires proof of clear and unequivocal notice such that the Union's subsequent failure to demand bargaining constitutes a 'conscious relinquishment' of the right to bargain." *Id.* at 806–07 (citations omitted).

When YHA assistant administrator Mullen telephoned union president Lewis in January 1990, he did not provide Lewis with "clear and unequivocal notice" of those alterations which YHA intended to make in its smoking policy. It is undisputed that he did not seek to bargain with the union regarding any modifications of working conditions. Instead, Mullen invited Lewis to join an employer-dominated task force which was being set up to discuss and to draft a no-smoking policy.

Such a task force plainly was not a substitute for formal negotiation. From the union's perspective, management had not announced a definitive change in work rules. Rather, it had backed away from doing so by organizing an ad hoc group to fashion the details of a smoke-free policy. Nothing yet had been put on the table over which to negotiate. As Mullen testified before the ALJ, the mandate of the task force was to *"look at ... the best way* to [implement a no-smoking policy]." (Emphasis added).

It must be recognized that the union was under no obligation to participate in any of the task force's sessions. Indeed, YHA could not establish how many meetings union representative Bonnie Flannery actually attended. In light of YHA's duty to bargain over its smoking policy, the union apparently decided to wait for a concrete proposal to emerge before considering whether to request negotiations.

This was what the union had done in 1987, when YHA became interested in limiting

---

**2.** The inexplicable and unsubstantiated adverse inferences drawn against Mullen and Butler contribute to our conclusion that the ALJ's credibility determination is tainted. *NLRB v. Norbar, Inc.*, 752 F.2d 235, 242 (6th Cir.1985).

smoking to designated areas. At that time, Mullen formed a committee to study the matter and to develop appropriate guidelines. As in the case at bar, this group was not a vehicle by which collective bargaining was to be carried out. Mullen afforded Lewis the opportunity to have a union representative serve on the committee, but Lewis declined his offer. When its work product was ultimately made known, Lewis did not ask to negotiate over the proposed revisions in policy because he felt they were reasonable.

I believe that both here and in 1987 the clock did not begin to run on whether the union waived its bargaining right until it became aware of the final, unequivocal policy statement of the management-directed group. When an employer, after expressing a desire to modify work conditions, invests an ad hoc committee with the power to hammer out the specifics, this should not be deemed "clear" notice of a "proposed change" in such conditions. *Henry Vogt*, 718 F.2d at 806. Even though the union may have a general idea of management's intentions, the devil is, often in the details. Until the committee completes its undertaking, the union has no reason to bargain.

I am not suggesting that whenever management wishes to alter the terms or conditions of employment it must initially inform the union of all of the details of the change it is pursuing. One of the purposes of collective bargaining is to define the rules of the workplace through a process of give and take. However, I am persuaded that the situation is different when an employer forestalls mandatory bargaining through creation of an informal policymaking group. The existence of such a group would naturally give the union the impression that any proposed modifications in policy were still in the process of being formulated. Should the union be asked to take part in the activities of the group, it would reasonably assume that management's proposals were open to informal discussion.

In the instant case, YHA did nothing to disabuse the union of notions of this sort. YHA vice president Cummins' April 2 letter to Lewis leads me to conclude that manage-ment never conveyed it was prepared to bargain over the no-smoking policy:

> I am unsure as to your reasons why YHA, Inc. must now negotiate this matter with the Union. *We have always looked upon the implementation of smoking restrictions in the Hospital as our right.* We have implemented earlier phases of our smoking restriction policy without request from your Union to negotiate.

(Emphasis added).

After reviewing the record, I am convinced that none of the agendas or policy drafts of the "Smoke–Free Facilities Task Force" that was transmitted to the union were unequivocal in spelling out what changes in smoking policy the group had devised. Once these revisions became known to the union on or about March 23, it made a timely request for negotiations. Whether this request was first communicated by Lewis during the March 23 gathering or through his March 27 letter to Cummins is of no moment. In view of my interpretation of events, it can hardly be said that the union "conscious[ly] relinquish[ed]" its bargaining right. *Henry Vogt*, 718 F.2d at 807. Therefore, I respectfully dissent.