16 F.3d 1220
 145 L.R.R.M. (BNA) 2768
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DAYTON ELECTROPLATE, INC., Respondent.
 No. 92-6723.
 United States Court of Appeals, Sixth Circuit.
 Feb. 3, 1994.
 
 Before: BOGGS and SILER, Circuit Judges; and CHURCHILL, Senior District Judge.*
 PER CURIAM.
 
 
 1
 The National Labor Relations Board (the Board) petitions for enforcement of an order requiring respondent Dayton Electroplate, Inc. (the Company) to cease and desist from bad faith bargaining, in violation of 29 U.S.C. Sec. 158(a)(1), (5), and to restore employment terms and conditions to the status existing as of May 30, 1993, prior to the Company's unilateral implementation of a new collective-bargaining contract. For reasons stated hereafter, we deny the Board's petition for enforcement.
 
 Background
 
 2
 The underlying dispute in this case revolves around the Company's actions in negotiating and implementing a new collective-bargaining agreement with the union representing the Company's production and maintenance employees.
 
 
 3
 The Company is in the business of electroplating various component parts for customers in the automotive and appliance industries. It was acquired in 1984 by its president and sole shareholder, Charles Borum. In November 1989, Borum met with the union's representative, John Buzard, and proposed a new three-year collective-bargaining agreement to replace the existing collective-bargaining agreement, which was set to expire on June 1, 1990. The employees rejected the proposal.
 
 
 4
 On March 27, 1990,[1] the parties commenced negotiations for a new collective-bargaining agreement and were unable to reach agreement. Confronted with Borum's claims that the Company was in serious financial trouble, the union hired a certified public accountant (CPA) to audit the Company's financial records. The CPA submitted a written report on March 30, stating, inter alia, that "this company is not without problems but its prospects are much brighter than the tax returns indicate.... I believe they are on the verge of becoming profitable and if enough sales can be generated, they can become substantially profitable." On April 2 and 3, the parties met again and the Company emphasized that its major customers were urging it to renew its labor contract well before the expiration date in order to avoid any possible disruptions in the customers' supply. Sometime prior to April 5, the parties reached agreement on all non-economic issues. On April 5 and 6, after the parties exchanged economic proposals, the Company made its "final" contract offer, which was subsequently rejected by a 20 to 3 vote of the bargaining unit on April 8. After the vote, Borum repeatedly questioned two of the bargaining unit members in an attempt to determine which three employees voted in favor of the offer.
 
 
 5
 On April 17, 19 and 23, the parties again met, but with the added help of a federal mediator. The only significant change from the Company's previous (April 5, 6) proposal was the Company's promise to create a safety committee and to help employees file health insurance claims. The bargaining unit voted on April 27 to reject the modified proposal once again. By letter dated April 30, the Company notified the union it was withdrawing all "offers, understandings and agreements" which had resulted from the previous contract negotiations. The Company's rationale for its withdrawal was that the union's failure to "timely ratify" the contract jeopardized the Company's relations with its customers and compounded the Company's serious financial condition.
 
 
 6
 In mid-May, the Company sent to the union copies of letters, which Borum had solicited from three major customers. The letters revealed that the named customers were concerned with the Company's inability to reach a new collective-bargaining agreement as they could not afford labor unrest because they needed an uninterrupted supply of parts. Two of the customers requested that they be kept advised of further developments so they could arrange for an alternate means of supply if needed. The third customer indicated that it was taking immediate steps to obtain other sources of supply.[2]
 
 
 7
 On May 22, nine days before the existing collective-bargaining agreement was to expire, the Company presented the union with a new proposal containing significant reductions in wages and benefits as compared to its earlier April 5, 6 proposal and the existing agreement. The Company stated the proposal was the best it had to offer, but it was not necessarily the final offer. On May 23 or 24, the Company notified the union that it would accept the April 5, 6 proposal if the union would ratify it as a counter-proposal. Once again the bargaining unit voted on the April 5, 6 proposal, this time rejecting it by a vote of 24 to 7. The union requested further negotiations on the contract. Borum stood firm by the May 22 proposal, but stated the Company would consider any union proposals which would accomplish the same economic relief.
 
 
 8
 On May 24, the Company posted a notice to employees on its bulletin board informing them that the Company had made its best offer and that it could no longer offer the conditions made in the April 5, 6 proposal. The parties once again met with a federal mediator on May 30. At this meeting, the Company offered to permit the employees to continue their health insurance coverage by deducting premiums from their pay or by accepting a larger wage cut. No agreement was reached as a result of this meeting. On May 31, the Company wrote the union and indicated that its May 22 offer would be implemented on June 1 as the parties were at an impasse.[3]
 
 
 9
 Between the time of the May 22 proposal and the expiration of the collective-bargaining agreement on June 1, the Company, through Borum, allegedly did the following: (1) instructed the managers not to speak with hourly workers unless another manager was present so as to avoid conflicts in case of a confrontation; (2) told the managers to keep an eye out for rules infractions and to "write the people up"; (3) told the managers to keep an eye out for troublemakers, specifically naming three individuals, and to write them up to "get them out of here"; (4) commented that he was going to teach the union to play poker "Texas-style"; and (5) met with two maintenance employees known to have favored ratification, thanked them for their loyalty, and told them that their health insurance would be taken care of and that they would be there long after the other employees were gone.[4] On June 1, the Company implemented its May 22 offer.
 
 
 10
 The Board found, in agreement with the ALJ, that the Company violated 29 U.S.C. Sec. 158(a)(1), (5) by withdrawing prior tentative agreements, making regressive contract proposals, and unilaterally implementing the May 22 contract proposal. The Board ordered the Company to cease and desist from bad faith bargaining and to restore all terms and conditions of employment to the status quo existing on May 30, 1990. The Board further ordered the Company to make whole employees who were detrimentally affected by the new contract and to bargain with the union as the exclusive representative of the employees.
 
 Discussion
 
 11
 If the Board's findings are supported by substantial evidence in the record as a whole, they may not be disturbed on appeal. See, e.g., 29 U.S.C. Sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); YHA, Inc. v. NLRB, 2 F.3d 168, 172 (6th Cir.1993). The Board's application of law to facts is also reviewed under the substantial evidence standard. East Tenn. Baptist Hosp. v. NLRB, 6 F.3d 1139, 1143 (6th Cir.1993). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Universal Camera Corp., 340 U.S. at 477 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In determining whether the evidence is substantial, the "reviewing court must take into account whatever in the record detracts from the NLRB's decision, [however,] it is not permitted to displace the NLRB's choice between two fairly conflicting views, even if the court would have made a different choice if the matter had been before it de novo." YHA, Inc., 2 F.3d at 172.
 
 
 12
 "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ...." Roadway Express, Inc. v. NLRB, 831 F.2d 1285, 1289 (6th Cir.1987) (quoting NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984)). Nevertheless, where the witnesses' versions of what occurred are completely opposite, the reviewing court should "examine the credibility determinations with care." YHA, Inc., 2 F.3d at 172. " 'A reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative agency action on appeal.' " Id. (quoting Krispy Kreme Doughnut Corp. v. NLRB, 732 F.2d 1288, 1290 (6th Cir.1984)).
 
 
 13
 Section 158(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively" with the employees' representative. The obligation to bargain collectively encompasses the duty "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Id. Sec. 158(d). Determining whether the parties have conferred in good faith is done by "drawing inferences from the conduct of the parties as a whole." See NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 498 (1960). To evince good faith collective bargaining, the conduct of the parties must show "the serious intent to adjust differences and to reach an acceptable common ground." Id. at 485 (internal quotations omitted). Nonetheless, a lack of good faith may not be premised simply on the fact that a party attempts to secure provisions that the other party deems unacceptable. Pease Co. v. NLRB, 666 F.2d 1044, 1049 (6th Cir.1981), cert. denied, 456 U.S. 974 (1982). Rather, a lack of good faith "may be found only from 'conduct clearly showing an intent not to enter into a contract of any nature.' " Id. (quoting NLRB v. United Clay Mines Corp., 219 F.2d 120, 125 (6th Cir.1955)). The Board has been "afforded flexibility to determine ... whether a party's conduct at the bargaining table evidences a real desire to come into agreement." Insurance Agents' Int'l Union, 361 U.S. at 498.
 
 
 14
 The Company argues the record lacks substantial evidence supporting the Board's decision that it committed unfair labor practices by withdrawing tentative agreements, by making regressive contract proposals without explanation, and by implementing its last contract proposal in the absence of a valid impasse. The Company claims the Board erroneously assumed that the Company could afford the April 5, 6 proposal because there was no evidence of a substantial loss in sales for the Company in March and April.[5] Further, the Company alleges the Board erred in finding credible the testimony of maintenance foreman George Steele, who testified as to Borum's actions away from the bargaining table.[6]
 
 
 15
 The Board argues that substantial evidence supports its finding that the Company engaged in bad faith bargaining. The following evidentiary examples are proffered as adequately supporting the Board's decision. The Company withdrew from tentative agreements that had been reached on some, but not all, issues and made a regressive contract proposal based on alleged loss of business and future loss of customers. Yet, at the same time, the Company expressed a willingness to accept the prior April 5, 6 proposal, thus belying the Company's stated rationale. Further, the Company offered no explanation for its decision to renege on its prior non-economic agreements when it made the regressive proposal.[7] Also, the Company, through Borum, acted, when away from the bargaining table, with anti-union animus on several occasions. For instance, Borum told supervisors to "write up people" for rules infractions and to "get [troublemakers] out of here"; stated he was going to teach the union how to play poker "Texas-style"; and told employees who voted in favor of the Company's proposal that he appreciated their loyalty, their health insurance would be taken care of, and they would be around long after the other employees were gone.
 
 
 16
 A careful review of the record indicates that the Company engaged in "lawful hard bargaining." Pease Co., 666 F.2d at 1049. Even giving full effect to the Board's credibility findings, the record lacks evidence showing that the Company refused to meet at reasonable times or with reasonable frequency, or refused to discuss a proposal. As the contract expiration date approached, the parties met with increased frequency. Regardless of whether the Company's sales for March through April were indicative of its future financial condition, it was permissible for the Company to insist on proposals, no matter how unacceptable to the Union, as long as its insistence was genuinely and sincerely held, even if it ultimately led to a stalemate. Id. at 1049. The Board drew improper inferences of bad faith from the Company's conduct. "Where, as here, there is no background of antiunion animus by an employer, trivial and ambiguous conversations between ... company official[s] and ... [their] employee[s] cannot form the basis of a Sec. 8(a)(1) violation." Id. at 1048.
 
 
 17
 This is simply a case of hard bargaining between two parties who were unable to come to an agreement. An employer has a right to withdraw proposals to reflect changed economic background. Id. at 1051. While the Board clearly disapproved of the terms of the Company's proposals, the law is well-settled that "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." Id. (internal quotations omitted). Neither the Company's proposals nor its tactics, nor the sum of its conduct, amounts to substantial evidence of bad faith. We therefore hold that the record lacks substantial evidence to support the Board's finding that the Company failed to bargain in good faith in violation of Sec. 158(a)(1) and 5.
 
 
 18
 Accordingly, the Board's petition for enforcement is denied.
 
 
 
 *
 The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 All references to dates hereafter are for the year 1990 unless otherwise stated
 
 
 [2]
 When asked if the Company was really going to lose the business of the companies that sent the letters, Borum allegedly replied: "it was nice to have friends in the right places at the right times." Although he denied he made this statement, Borum admitted that he solicited the letters in order to bring the need for early agreement to the attention of the union. The ALJ found credible the testimony of maintenance foreman George Steele who credited Borum with the above-quoted statement. Likewise, the Board accepted the ALJ's credibility findings
 
 
 [3]
 Borum and his son claimed the federal mediator stated that the parties appeared to be at an impasse. The ALJ found the Borums' claim credible as union representative Buzard did not deny the assertion
 
 
 [4]
 The source of these allegations was the testimony of maintenance foreman George Steele. The only portion of Steele's testimony which was disputed was Borum's reference to playing poker "Texas-style." The ALJ found Steele's testimony credible
 
 
 [5]
 The company claims the key factor showing that it could no longer afford the April 5, 6 proposal was the projected fall in sales
 
 
 [6]
 The Company provides three reasons to reverse the Board's credibility findings as to witness Steele: (1) his testimony conflicts with Borum's testimony; (2) he could have misinterpreted Borum's directives; and (3) he had reason to fabricate his statements because he had been fired by Borum only a few months prior to testifying
 
 
 [7]
 The Company's failure to justify withdrawing its prior non-economic agreements with the union and its actions away from the bargaining table were the two factors the Board primarily relied upon in concluding the Company acted in bad faith