98 F.3d 892
 153 L.R.R.M. (BNA) 2641, 132 Lab.Cas. P 11,686
 TAYLOR WAREHOUSE CORPORATION, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
Truck Drivers, Chauffeurs and Helpers, Local 100, an
Affiliate of the International Brotherhood of
Teamsters, AFL-CIO, Intervenor.
 Nos. 94-6041, 94-6160.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 4, 1996.
Decided Oct. 24, 1996.
 
 William K. Engeman (argued and briefed), Roger A. Weber (briefed), Michael A. Manzler, Taft, Stettinius & Hollister, Cincinnati, OH, for Petitioner/Cross-Respondent.
 Aileen A. Armstrong, Dep. Assoc. Gen. Counsel (briefed), Paul J. Spielberg, David A. Fleischer (argued), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross-Petitioner.
 Barbara M. Harvey (briefed), Detroit, MI, for Intervenor.
 Before: MARTIN, Chief Judge; BATCHELDER, Circuit Judge; WISEMAN, District Judge.*
 BOYCE F. MARTIN, Jr., Chief Judge.
 
 
 1
 The Taylor Warehouse Corporation has petitioned for review of a National Labor Relations Board order finding that the company engaged in unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. §§ 151, et seq. The Board and the Intervenor, Truck Drivers, Chauffeurs and Helpers, Local Union 100, a/w the International Brotherhood of Teamsters AFL-CIO, seek enforcement of the order. For the following reasons, we ENFORCE the Board's order.
 
 
 2
 The Taylor family has operated freight warehousing and transportation businesses under various names for over one hundred years in Cincinnati, Ohio. At all material times, Taylor Warehouse Corporation has engaged in warehousing merchandise and Taylor Distributing Company has engaged in the interstate transportation of freight at a facility shared by the companies on East Sharon Road in Cincinnati.[1]
 
 
 3
 In 1961, Taylor Trucking Company and the Truck Drivers, Chauffeurs and Helpers, Local Union 100, a/w the International Brotherhood of Teamsters AFL-CIO entered into a National Master Freight Agreement covering drivers employed by Taylor Trucking. Shortly thereafter, Taylor Trucking changed its name to Taylor Distributing and, beginning in 1964, executed a series of warehousing agreements with the union. The 1964 warehousing agreement contained the following language relating to the scope of the bargaining unit:
 
 
 4
 This agreement shall cover all employees of the Employer engaged in handling, loading or unloading of freight or merchandise on the docks or premises of the Employer and in the maintenance of such premises, excepting office employees, watchmen, chief engineer, master carpenter and other employees not properly under the jurisdiction of the Union.
 
 
 5
 In 1972, Taylor Distributing moved to the East Sharon Road facility and several Taylor Distributing warehousemen became employees of Taylor Warehouse, a newly-formed entity. After the move, Taylor Distributing gradually phased out its trucking operations, and by 1978 no longer employed any union members as drivers. For several years, Taylor Distributing utilized independent owner-operators, and then, in 1982, began hiring drivers who worked directly for the company on a nonunion basis.
 
 
 6
 In 1985, Taylor Distributing hired three or four "helpers" (later called "distributors"), who separated and wrapped pool freight, filled orders, and loaded pool freight onto Taylor Distributing trucks.[2] The distributors, who allegedly were doing work which previously had been the responsibility of Taylor Warehouse warehousemen, were not part of the warehousemen's collective bargaining unit. The basis for one of the claims in this case is that, prior to 1985, Taylor Warehouse warehousemen loaded and unloaded all pool and warehouse freight. A gradual decline in the amount of pool freight work done by the warehousemen was alleged to have followed until late 1991, when the assignment of pool freight work to the warehousemen ceased.[3]
 
 
 7
 In 1987, Taylor Warehouse proposed the creation of a two-tier system whereby only those employees with greater seniority would receive pension benefits. The employees ratified the proposal and it was implemented, but the Central States Pension Fund refused to approve the agreement, and the parties were unsuccessful in resolving this problem during the next several years. Throughout this time, the scope clause of the warehousemen's collective bargaining agreement remained essentially unchanged. According to the union, until the latter half of 1991, the original scope language drew no distinction between warehouse and pool freight, and recognized that unit employees handled all of the employer's freight.
 
 
 8
 In August of 1990, shortly before the collective bargaining agreement was set to expire, the parties agreed to sign separate agreements covering the top tier ("receiving") employees and the second tier ("ordering") employees. The union claimed that the parties did not intend to create two separate bargaining units, and signed a side letter integrating the two agreements. The Central States Pension Fund approved the arrangement, but cautioned that the parties' Fund participation would be terminated if they did not negotiate an agreement covering all employees who performed essentially the same type of work.[4]
 
 
 9
 After negotiations for a new contract began, the company inserted the word "warehouse" before the words "freight" and "merchandise" in the scope clause of the collective bargaining agreement. Union representatives later claimed that they did not notice the addition of the word "warehouse" and did not understand the significance that the company attached to the term until much later.
 
 
 10
 In June of 1991, while contract negotiations were continuing, a number of unit employees filed a complaint with the United States Occupational Safety and Health Administration alleging safety hazards at the Sharon Road facility. After the complaint was filed, the president of Taylor Warehouse stated that the complaint would not help negotiations, suggested that a particular employee had instigated the complaint, and confiscated that employee's electric forklift. The employee filed an individual complaint with the Occupational Safety and Health Administration in July, alleging that the change of equipment was in retaliation for his role in filing the initial complaint. The agency inspected the plant later that month and, in September, entered into a settlement agreement whereby Taylor Warehouse returned the electric forklift. The agency also cited the company for numerous safety violations, and entered into an additional settlement agreement in October under which the company was required to pay approximately $8,000.00 in penalties. While these events were occurring, the vice president of operations at Taylor Warehouse told an employee that the company was going to "get tough" and would be assigning all pool freight work to Taylor Distributing employees in the future.
 
 
 11
 In the Fall of 1991, the company agreed to reunify the bargaining unit and returned to explicit two-tier language in a single contract. The parties still failed to reach agreement, however, because the company insisted on adding language to the scope clause excluding pool freight from the definition of bargaining unit work while the union continued to assert that the term "warehouse freight" in the contract included pool freight.
 
 
 12
 On January 22, 1992, the parties initialed a scope proposal drafted by the company which was the same as its August of 1991 proposal (which had been rejected by the union),[5] except for the addition of a sentence allowing Taylor Distributing employees to load warehouse freight and merchandise. The union representative initialed the draft with the apparent understanding that this sentence, which he had underlined, would be deleted. One month later, when the company presented the same scope proposal without having deleted the underlined language, the union representative notified the company that the parties had no agreement on this issue. These events culminated in the filing of unfair labor practice charges against Taylor Warehouse.[6] The charges primarily alleged that the company had engaged in unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. §§ 151, et seq., by unlawfully transferring bargaining unit work to non-unit employees, and by insisting to impasse on a permissive subject of bargaining.
 
 
 13
 On July 14, 1993, an administrative law judge issued a recommended decision and order finding that the handling of pool freight was bargaining unit work, and that the company's assignment of such work to non-unit employees was discriminatorily motivated and unlawful without union consent,[7] in violation of 29 U.S.C. §§ 158(a)(1), (3) and (5). The administrative law judge further found that the transfer of work was in retaliation for the unit employees' filing of an Occupational Safety and Health Administration complaint, and that the transfer and resulting layoffs of three employees violated Sections 8(a)(1) and (3) of the Act. In addition, the administrative law judge found that Section 10(b) did not preclude these findings, because the union and affected employees did not receive unequivocal notice of the transfer of unit work more than six months before the filing of the unfair labor practice charges. The administrative law judge also found that Taylor Warehouse violated Sections 8(a)(1) and (5) of the Act by insisting to impasse on a proposal to alter the scope of the bargaining unit. On July 27, 1994, the National Labor Relations Board issued a decision and order affirming the administrative law judge's rulings, findings, and conclusions, and adopting the recommended order with certain modifications.
 
 
 14
 On appeal, Taylor Warehouse argues that the Board erred in finding that the company unlawfully transferred unit work to non-unit employees; that the charge pertaining to the transfer of work was time-barred; and that the Board erred in finding that the company bargained to impasse on a permissive subject of bargaining. The Board, in its cross-appeal, argues that substantial evidence supports its findings that Taylor Warehouse unlawfully transferred bargaining unit work to non-unit employees and improperly insisted to impasse on a proposal to alter the scope of the bargaining unit. The Board further argues that it reasonably concluded that the claim that unit work was unlawfully transferred was not time-barred, and that it acted within its discretion in ordering Taylor Warehouse to restore work and make employees whole for losses resulting from the unlawful transfer of work.
 
 I.
 
 15
 Before addressing the merits of the parties' arguments, we note that our review of the Board's decisions is limited. We have set forth the appropriate standard of review as follows:
 
 
 16
 A reviewing court may not disturb the Board's findings of fact where there is substantial evidence on the record considered as a whole to support the Board's findings. The Board's findings must be set aside when the record demonstrates that the Board's decision is not "justified by a fair estimate of the worth of the testimony of witnesses" or by the Board's "informed judgment on matters within its special competence or both." When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and thus this court ordinarily will not disturb credibility evaluations by an [administrative law judge] who observed the witnesses' demeanor.
 
 
 17
 The Board's application of the law to particular facts is also reviewed under the substantial evidence standard and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it de novo. Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision. The appellate court should consider the evidence contrary to the Board's conclusions, but may not conduct de novo review of the record.
 
 
 18
 If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has "no reasonable basis in law."
 
 
 19
 Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986) (internal citations omitted). With these standards in mind, we turn to address the merits of the parties' claims.
 
 
 20
 We first address Taylor Warehouse's argument that the union's allegation of an unlawful transfer of bargaining unit work was time-barred by Section 10(b). Section 10(b) provides that an unfair labor practice charge must be brought within six months of an alleged infraction. 29 U.S.C. § 160(b). This time period "accrues from the date that the plaintiff 'discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.' " Nida v. Plant Protection Assoc. Natl., 7 F.3d 522, 525 (6th Cir.1993) (citation omitted). In other words, the Section 10(b) period "begins to run at the time an employee receives unequivocal notice of an adverse employment action rather than the time that action becomes effective." Armco, Inc. v. NLRB, 832 F.2d 357, 362 (6th Cir.1987), cert. denied, 486 U.S. 1042, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988). The defendant bears the burden of establishing that a charging party received such notice. AMCAR Div., ACF Indus., Inc. v. NLRB, 596 F.2d 1344, 1351 (8th Cir.1979).
 
 
 21
 The administrative law judge found, and the Board agreed, that the statutory period of limitations began to run in this case on July 28, 1991 (i.e. six months before the unfair labor practices charge filed by the union on January 28, 1992). The administrative law judge and the Board reached this conclusion despite their determinations that the assignment of pool freight work to distributors initially occurred well before the Section 10(b) period began. They did so on the ground that Taylor Warehouse continued to assign some pool work to unit employees until after July 28, 1991. The administrative law judge and Board concluded:
 
 
 22
 [T]he Respondent gave mixed signals to the warehousemen regarding their responsibility for pool goods. The Taylors may have talked one way about the distributors' work, but they acted in another.... Thus, there can be no doubt that this diversion of work continued during the 10(b) period. Consequently, although the diversion of work in the years prior to July 1991 may be considered for background purposes only, the Union's charge filed on January 28, 1992, was not time barred.
 
 
 23
 On appeal, Taylor Warehouse claims that both the Supreme Court and this Court have rejected the concept that an alleged continuing violation can revive time-barred claims and argues that unit employees had unequivocal notice of the allegedly unlawful conduct well before the Section 10(b) period began. Specifically, the company claims that distributors worked exclusively on pool freight for over six years; that it had taken the position both before and during the 1987-1990 contract negotiations that pool freight work did not belong to the union and could be assigned to distributors; and the insertion of the word "warehouse" in the scope clause of the 1990 contract indicated that the company could assign pool freight work to non-unit employees.
 
 
 24
 In reviewing the Board's determination that the union's claim was not time-barred, we note that "the date upon which the alleged violation of the [National Labor Relations Act] occurred represents a factual finding and, as such, is conclusive 'if supported by substantial evidence on the record considered as a whole.' " Vemco, Inc. v. NLRB, 79 F.3d 526, 528 (6th Cir.1996) (citation omitted). We may not supplant such a factual finding even if we identify "an alternative conclusion that could be supported by substantial evidence." Id.
 
 
 25
 Taylor Warehouse properly notes that United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), precludes a court from attaching any legal consequence to an allegedly unlawful act which is not made the basis of a timely charge. As the Supreme Court stated, such an act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." Id. at 558, 97 S.Ct. at 1889. We distinguish the situation that existed in United Air Lines, Inc., however, from that presented by the instant case. In United Air Lines, Inc., the plaintiff argued that an airline's seniority system gave present effect to a past illegal act of discrimination. The Supreme Court rejected the plaintiff's argument that this action constituted a "continuing violation" and stated that the plaintiff was correct "in pointing out that the seniority system gives present effect to a past act of discrimination. But [the airline] was entitled to treat that past act as lawful after [the plaintiff] failed to file a charge of discrimination within the [applicable statute of limitations]." By contrast, in the case before us, the Board did not impose liability for any acts committed by the company outside of the Section 10(b) period. Rather than imposing liability for present continuing effects of a pre-statutory violation, the Board found that independent unlawful acts were committed within the Section 10(b) period and sought to hold Taylor Warehouse accountable for that conduct.
 
 
 26
 Substantial evidence on the record as a whole supports the Board's finding that independent unfair labor practices were committed within the Section 10(b) period. Evidence in the record shows the following: (1) unit employees filed their Occupational Safety and Health Administration complaint in the summer of 1991, an employee filed a retaliation complaint in July of 1991, and both complaints were settled in the fall of 1991; (2) while the Occupational Safety and Health Administration complaint was pending, the company announced the removal of all pool freight work to Taylor Distributing employees; and (3) several unit employees testified that they continued to handle pool freight until late 1991. Thus, substantial evidence supports the Board's finding that unit employees did not receive clear and unequivocal notice before the statute of limitations period that the company intended to transfer all pool freight work to non-union employees. The Board properly held that the union's claim of an unlawful transfer of unit work was not time-barred by Section 10(b).
 
 II.
 
 27
 Because we find that the union's claim is not time-barred, we must address the propriety of the Board's rulings with regard to the alleged unilateral transfer of bargaining unit work to non-unit employees.
 
 
 28
 In its decision, the Board upheld the administrative law judge's finding that the handling of pool freight was bargaining unit work and that Taylor Warehouse violated Sections 8(a)(5), (3) and (1) by unilaterally transferring such work to non-unit employees without bargaining with or providing notice to the union. The Board agreed with the administrative law judge that the company transferred the work in retaliation for the unit employees' filing of an Occupational Safety and Health Administration complaint, and that the transfer and resulting layoffs of three employees violated the National Labor Relations Act as well.
 
 
 29
 On appeal, Taylor Warehouse claims that the Board's findings were erroneous and not supported by substantial evidence because the union had been put on notice since 1985 that pool freight handled by the distributors was not considered to be within the jurisdiction of the unit employees, was restated often, and was recognized and accepted by the parties. Taylor Warehouse claims this is especially true in light of the parties' 1990 revision to the collective bargaining unit.
 
 
 30
 Assuming transfers are not specifically prohibited by the collective bargaining agreement, an employer may transfer work out of a bargaining unit if: (1) the employer complies with Fibreboard Paper Products v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), by bargaining in good faith to impasse; and (2) the employer is not motivated by anti-union animus. University of Chicago v. NLRB, 514 F.2d 942, 949 (7th Cir.1975). The issue presented by this case is whether Taylor Warehouse bargained in good faith to impasse about the transfer of work to non-unit employees, or whether it transferred work unilaterally without notice to or good-faith bargaining with the union.
 
 
 31
 The administrative law judge found that, from 1972 until sometime in the mid-1980s, Taylor Warehouse unit employees were wholly responsible for moving all warehouse and pool freight that entered and left the warehouse. The administrative law judge further found that, some years later and over the protestations of the Taylor Warehouse workers, the company claimed that pool freight operations were the exclusive preserve of non-unit Taylor Distributing employees, although the warehousemen continued to handle some pool and warehouse freight until the Fall of 1991. The administrative law judge stated:
 
 
 32
 Although the record leaves much to be desired, I find the testimony of the government's witnesses more consistent and reliable as to the diversion of pool freight throughout 1991 than were the accounts of the Respondent's witnesses. According to the credited statements of the warehousemen, prior to 1985, bargaining unit employees handled all freight, warehouse and pool, and performed all unloading and loading. They continued to handle pool assignments over the years, although their share of it declined, until sometime in the fall of 1991, when it ceased altogether.
 
 
 33
 Our review of the record reveals that the administrative law judge and the Board commented in detail about the credibility of the various witnesses and gave succinct reasons for their determinations. "[C]redibility determinations made by the administrative law judge and adopted by the Board are entitled to great weight.... We will overturn those determinations only if they 'overstep the bounds of reason.' " Kusan Mfg. Co. v. NLRB, 749 F.2d 362, 366 (6th Cir.1984) (citations omitted); Adair Standish Corp. v. NLRB, 912 F.2d 854, 860 (6th Cir.1990) (stating that "it is the Board's function to resolve questions of fact and credibility where there is a conflict in the testimony"). We find sufficient support in the record for the determinations that Taylor Warehouse diverted work from the bargaining unit without notice to or bargaining with the union, and that the company did so for unlawful discriminatory reasons. The Board's determination that the company unilaterally transferred bargaining unit work to non-unit employees is entitled to affirmance.
 
 III.
 
 34
 Next, we review the Board's finding that Taylor Warehouse violated Sections 8(a)(5) and (1) of the Act by unlawfully insisting that the union agree to amend the unit description so that certain work would be assigned to non-union employees. On appeal, Taylor Warehouse contends that its insistence was lawful because the dispute concerned an assignment of work rather than a redefinition of the unit.
 
 
 35
 Section 8(a)(5) of the National Labor Relations Act requires an employer to bargain collectively with its employees' representatives in good faith about "rates of pay, wages, hours of employment, or other conditions of employment." In light of this obligation, an employer may not take unilateral action regarding a mandatory subject of bargaining prior to bargaining to impasse. See NLRB v. Plainville Ready Mix Concrete, 44 F.3d 1320, 1325-26 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995) (stating that after good-faith negotiations have exhausted the prospects of reaching agreement, an employer may make unilateral changes that are "reasonably comprehended within his pre-impasse proposals"). The parties may also bargain about any other lawful proposal, but may not insist to impasse on proposals concerning non-mandatory subjects of bargaining. Because the Board is deemed to have special expertise regarding the "classification of bargaining subjects as 'terms or conditions of employment,' " we grant a Board judgment regarding what constitutes a mandatory topic of bargaining "considerable deference." Ford Motor Co. v. NLRB, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979).
 
 
 36
 This Circuit has held that, while jurisdictional clauses concerning the assignment of work to union members are mandatory subjects of bargaining, a union description clause setting forth the scope of unit membership is a permissive subject of bargaining. Newspaper Printing Corp. v. NLRB, 692 F.2d 615, 619 (6th Cir.1982). Because the scope of the bargaining unit is a permissive subject of bargaining, the parties may bargain about that subject by mutual consent. Id. at 620. However, because such bargaining is permissive only, neither party may bargain to impasse or condition bargaining on mandatory bargaining issues on such a subject. Id.
 
 
 37
 Where a bargaining unit dispute has been framed as involving work assignments, the question in determining whether a mandatory or permissive subject is involved is whether the employer "insisted upon a change in the unit description." Antelope Valley Press & Bakersfield Typographical Union, 1993 WL 189962 * 4 (D.C.1993). If the employer did so, any such insistence will be held to be unlawful, even if the unit is described in terms of work performed. Id. In this case, the Administrative Law Judge stated:
 
 
 38
 Although the Respondent's proposal did not alter the unit description, it was designed to legitimize the transfer of all pool work to employees outside the bargaining unit. Thus, the proposal was an overt exercise in unit exclusion--it was meant to strip pool work from the unit employees' jurisdiction and reserve such work for distributors who were expressly excluded from the unit.
 
 
 39
 The administrative law judge found and the Board held that, "because the Respondent's bargaining proposal was designed to curtail the represented employees' jurisdiction and deny the Union the right to assert that the individuals to whom unit work was assigned were unit members ... the proposal was a permissive subject of bargaining."
 
 
 40
 We uphold this finding and believe that substantial evidence in the record supports the determination that Taylor Warehouse violated its duty to bargain in good faith by bargaining to impasse on the company's demand to modify the contractual scope clause, thereby violating Sections 8(a)(5) and (1). We further find that the union did not waive its right to challenge the employer's scope proposal by initialing the proposal during a 1992 negotiating session. An employer violates Section 8(a)(5) if it "unilaterally changes a term or condition of employment over which it has a duty to bargain with the union representing its employees." YHA, Inc. v. NLRB, 2 F.3d 168, 172 (6th Cir.1993). No such violation occurs, however, where a union has waived its right to bargain. Id. It is clearly established that a "waiver of section 8(a)(5) rights must be 'clear and unmistakable.' " See Tocco Div. of Park-Ohio Indus., Inc. v. NLRB, 702 F.2d 624, 626 (6th Cir.1983). In reviewing a Board's determination of whether a party waived its section 8(a)(5) rights, we must accept the standard applied by the Board if it is "rational and ... consistent with the purposes of the Act." Id. at 627. So long as the Board's construction of the Act is "reasonably defensible," that determination is entitled to affirmance even if we might prefer a different construction. Id.
 
 
 41
 In addressing the waiver claim, the administrative law judge disagreed with Taylor Warehouse's arguments that the parties successfully executed a revised description of the unit's work, which limited the union's exclusive jurisdiction to "warehouse freight" and "warehouse merchandise," and that the union forfeited any claim it may have had that the warehousemen were entitled to handle pool freight by entering into the 1987-90 agreement containing that revised description. Instead, the administrative law judge stated: "I find it implausible that [the union's business agent] meant to accept rather than strike the underlined language, when it was contrary to the unit members' persistent efforts to retrieve bargaining unit work which they claimed had been wrongfully diverted to the distributors."In adopting the administrative law judge's findings, the Board found that the company failed to sustain its burden of proving that the meaning of changed terms was " 'fully discussed' or 'consciously explored' and that the union 'consciously yielded' or clearly and unmistakably waived its interest in the matter." Tocco, 702 F.2d at 628. The waiver standard applied by the Board in this case was neither irrational nor inconsistent with the Act's purposes. The Board evaluated the parties' bargaining history and practice along with the contractual language at issue, and we believe substantial evidence on the record as a whole supports the Board's finding that the union did not waive its section 8(a)(5) rights in this case. Because the Board's application of the waiver test to the facts of this case is supported by substantial evidence on the record as a whole, it must be enforced.
 
 IV.
 
 42
 Finally, we address the issue of whether the Board acted within its discretion in fashioning a remedy for the unfair labor practices that were committed. Title 29 U.S.C. § 160(c) authorizes the Board to order a party who has violated the National Labor Relations Act to "cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter."
 
 
 43
 In this case, the administrative law judge recommended that Taylor Warehouse be ordered to cease and desist from violating Sections 8(a)(1), (3) and (5) of the National Labor Relations Act, and to take certain affirmative action. The Board adopted this recommendation and ordered the company to revoke the unilateral termination of pool assignments which occurred after July 28, 1991, and to restore that work to the unit employees. In addition, the Board ordered the company to bargain in good faith by ceasing to condition its acceptance of a contract on the union's consenting to an amendment of the scope provision. The Board further ordered the company to reinstate the three laid-off employees and to make all unit employees whole for any losses suffered due to the unilateral diversion of unit work. Finally, the Board ordered the company to post a notice which included a commitment to refrain from committing unfair labor practices.
 
 
 44
 The Board's "remedial authority is 'a broad discretionary one, subject to limited judicial review.' " Colfor Inc. v. NLRB, 838 F.2d 164, 167 (6th Cir.1988) (citing Fibreboard Paper Products Corp., 379 U.S. at 216, 85 S.Ct. at 406). We therefore may not disturb a Board's order unless it constitutes an abuse of discretion. Id. at 168; See also Adair Standish Corp., 912 F.2d at 864 (stating that "[a] remedial order of the Board will not be disturbed 'unless ... the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations Act]' ").
 
 
 45
 On appeal, Taylor Warehouse argues that the Board has directed the reassignment of an unknown quantum (i.e. "fair share") of pool work which cannot be established in backpay proceedings. The company claims that "fair sharing" was never the basis of the company's work assignments, and, moreover, that the Board may not dictate contract terms even where a company violates its duty to bargain in good faith.
 
 
 46
 The Supreme Court has held that, "while the Board does have the power under the National Labor Relations Act ... to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective bargaining agreement." H.K. Porter Co. v. NLRB, 397 U.S. 99, 102, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970). Pursuant to Section 8(d) of the National Labor Relations Act, the Board may not, "either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." Id. at 106, 90 S.Ct. at 825. While the Board's remedial powers under Section 10 are broad, they are "limited to carrying out the policies of the Act itself. One of these fundamental policies is freedom of contract." Id. at 108, 90 S.Ct. at 826.
 
 
 47
 In this case, we believe the Board, in its order, was seeking to restore the status quo by ordering the company to restore work to the bargaining unit and to make unit employees whole. Such orders are presumptively valid, and will be overturned only where a company can show that undue hardship would result if it were required to comply with the order. See Power Inc. v. NLRB, 40 F.3d 409, 425 (D.C.Cir.1994). We do not find that to be the case here. Furthermore, we do not accept the company's contentions that the order to restore work to the bargaining unit improperly requires the company to concede certain contractual terms. Nothing in the Board's order requires the company to agree that unit employees will continue to perform pool work in the future. Instead, the order simply prohibits the transfer of additional pool work to non-unit employees without notice and good-faith bargaining.
 
 
 48
 For the foregoing reasons, the Board's order is ENFORCED.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 Taylor Warehouse and Taylor Distributing are commonly owned, operate out of the same location, and, by stipulation, constitute a single employer for purposes of this case
 
 
 [2]
 Warehouse freight and pool freight are two different types of freight. Warehouse freight is sent unsold by a manufacturer to a warehouse, where it is unloaded, inventoried, and stored until sold. Pool freight is freight that has been sold prior to its delivery to the warehouse. At the warehouse, it is unloaded, separated into different orders, and transferred to the dock for reloading and delivery
 
 
 [3]
 By January of 1991, there were ten distributors, and by the end of 1991, there were fifteen. According to the union, by late 1991, the warehousemen performed almost no unloading, and only loaded Taylor Distributing trucks when the distributors needed assistance. The union further contended that by the Fall of 1991, the remaining Taylor Warehouse employees suffered from a lack of work, and three bargaining unit employees were laid off, while the non-union side of the workforce worked a considerable amount of overtime
 
 
 [4]
 In November of 1990, when the parties began negotiations for a new agreement, the Fund sent the company a notice informing it of the Fund's policy not to approve split bargaining unit arrangements that provided coverage for only part of a bargaining unit. During negotiations, however, the company allegedly insisted upon splitting the bargaining unit, which resulted in the termination of the company's participation in the Fund and the loss of Taylor Warehouse employees' pension rights
 
 
 [5]
 The scope proposal stated:
 This agreement shall cover all First, Second tier and General Warehousemen employees of the employer, engaged in receiving, as unloading [sic], or assisting in unloading, handling, storing, filling, staging in areas designated by the employer, and assisting in loading, when requested by the employer of Warehouse freight or Warehouse merchandise on the dock or premise of the employer, which rents space from Sharon Road Property; excepting office employees, repackers checkers, engineers, carpenters, maintenance and other employees not properly under the jurisdiction of the Union, such as employees of Taylor Distributing, which also rents space, dock doors, and dock sorting areas, office and parking space from Sharon Road Property, to receive, unload, sort, stage, fill, handle and load its pools and pickup freight. [Union represented employees may assist in this operation when requested by the employer.]
 
 
 [6]
 Robert Jensen, a Taylor Warehouse employee, filed an unfair labor practice charge on December 13, 1991, alleging a verbal communication in violation of Section 8(a)(1). The filing of this charge resulted in the Board filing a complaint on January 30, 1992. The Board found several independent Section 8(a)(1) violations based on statements made several months before the 1990 contract negotiations began by the president of Taylor Warehouse. Taylor Warehouse does not seek review of these findings. The union then filed an unfair labor practice charge in January of 1992, which resulted in a consolidated complaint dated March 10, 1992 alleging that the company violated Sections 8(a)(1), (3), and (5) of the National Labor Relations Act
 
 
 [7]
 The Board modified the latter part of this finding to hold that a work assignment to non-union distributors was unlawful unless subjected to bargaining